# IN THE SUPREME COURT OF IOWA

No. 08–0952

Filed April 30, 2010

**NEVADACARE, INC.** d/b/a
**i/hx IOWA HEALTH SOLUTIONS, INC.,**

Appellant,

vs.

**DEPARTMENT OF HUMAN SERVICES** and
**KEVIN W. CONCANNON,** in His Official Capacity
as Director, Department of Human Services,

Appellees.

Appeal from the Iowa District Court for Polk County, Carla T. Schemmel, Judge.

A party to a series of contracts appeals a district court order denying its breach of contract claims and requiring it to pay the prevailing party's attorney fees. **AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

Michael A. Dee of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, David L. Brown of Hansen, McClintock & Riley, Des Moines, and Matthew G. Weber and Stephen G. Masciocchi of Holland & Hart, LLP, Denver, Colorado, for appellant.

Mark E. Weinhardt, David Swinton, Margaret C. Callahan, and Danielle M. Shelton of Belin Lamson McCormick Zumbach Flynn, Des Moines, for appellees.

**WIGGINS, Justice.**

In this appeal, we must decide if the district court properly determined that NevadaCare, Inc. d/b/a i/hx Iowa Health Solutions, Inc. was not entitled to damages under a series of contracts setting capitation rates payable to it. We must also decide whether the district court correctly awarded the department of human services and Kevin W. Concannon (hereinafter collectively referred to as "DHS") attorney fees under the contracts. On our review of the record, we find DHS did not breach its contracts with NevadaCare. We find, however, that only one of the contracts entitled DHS to attorney fees and litigation costs. Accordingly, we affirm the judgment of the district court granting judgment in favor of DHS on all claims on the merits, reverse the judgment of the district court awarding DHS attorney fees and litigation costs, and remand the case to the district court for further proceedings to determine an appropriate award of attorney fees and litigation costs limited to the contract for fiscal years 2004 and 2005.

## I. Background Facts and Proceedings.

After closely and carefully scrutinizing the record, we find the record supports the following facts found by the district court. Beginning in fiscal year 1998, NevadaCare entered into a series of contracts with DHS in which NevadaCare agreed to provide managed health care services as a health maintenance organization (HMO) for enrollees in Iowa's Medicaid program. In consideration for providing its services, DHS agreed to pay NevadaCare monthly capitation payments for each Medicaid enrollee enrolled with NevadaCare. DHS paid the monthly capitation rates regardless of whether the Medicaid enrollees received medical services from NevadaCare in that month. This relationship lasted until February 1, 2005. During this period, the parties entered

into a series of five contracts. Three separate contracts covered fiscal years 1998, 1999, and 2003. One contract covered fiscal years 2000 to 2002, while another contract covered fiscal years 2004 to 2005. The contracts were risk-based contracts, meaning they did not guarantee NevadaCare a profit. Thus, if NevadaCare's actual costs of providing managed health care services to its enrollees were greater than the capitation payments it received, it could incur losses under the contracts.

At the time the parties entered into their first contract, the Centers for Medicare and Medicaid Services (CMS) mandated that capitation rates be less than the upper payment limit (UPL) to ensure the managed care delivery model was more cost efficient than the traditional fee-for-service model. *See* 42 C.F.R. § 447.361 (1997). The contracts define UPL as the projected cost of providing services to an actuarially equivalent population in a fee-for-service program. In accordance with this federal mandate, the Iowa Administrative Code required capitation rates to be actuarially determined for the beginning of each new fiscal year and stated, "[t]he capitation rate shall not exceed the cost . . . of providing the same services on a fee-for-service basis." Iowa Admin. Code r. 441—88.12(2) (1997). Rather than employ its own actuaries to calculate these rates, DHS contracted with the actuarial accounting firm Milliman U.S.A., Inc. f/k/a Milliman & Robertson, Inc., to calculate the capitation rates.

The contracts for fiscal years 1998, 1999, and 2000 called for capitation payments to NevadaCare at 97% of the UPL. For the fiscal years 2001, 2002, and 2003, these capitation payments increased to 98% of the UPL. In fiscal year 2004, CMS promulgated a new regulation allowing states to set capitation rates above the UPL if necessary to

achieve actuarial soundness. *See* 42 C.F.R. § 438.6(c) (2004). Thus, in fiscal year 2004, DHS abandoned its UPL rate-setting methodology and instead applied a new managed care methodology, which attempted to project the actual cost for a reasonably efficient managed care organization to provide services to Medicaid enrollees for the upcoming fiscal year. Under this new methodology, Milliman developed and used an actuarial tool referred to as degrees of health management to identify a projected cost range for each rate category. Milliman then set specific capitation rates for each category at various points within the actuarially projected ranges. This new methodology was more complex than the previous UPL methodology that DHS utilized in its earlier contracts.

Each contract required DHS to calculate the capitation rates it would pay NevadaCare. Consequently, each contract contained an addendum consisting of a report prepared by Milliman describing the actuarial work it performed and the methodology it used to calculate the capitation rates for the applicable contract. The reports also contained capitation rate charts, which laid out the results of Milliman's work. These rate charts provided the specific capitation rates DHS paid NevadaCare on a monthly basis for each Medicaid enrollee enrolled in NevadaCare's plan.

Before entering each contract, NevadaCare had the opportunity to review the entire contract, including the capitation rates contained in the rate charts, and decide whether to enter into the agreement. NevadaCare financially analyzed the rates to see if they were consistent with its budget, but it never employed its own actuaries to review the accuracy of the rates. It is undisputed that from fiscal years 1998 to 2005, NevadaCare consistently entered into the contracts in issue and DHS paid the capitation rates listed in the rate charts.

The language dealing with the capitation rates for each contract is as follows:

**Fiscal year 1998**

In full consideration of contract services rendered by the HMO, the DEPARTMENT agrees to pay the HMO monthly payments based on the HMO's decisions concerning optional services and reinsurance as specified in Addendum VI at the capitation rates established for counties within the identified regions as outlined in ADDENDUM XV. Capitation rates are calculated on an actuarial basis recognizing payment limits set forth in 42 CFR 447.361.

**Fiscal year 1999**

In full consideration of contract services rendered by the HMO, the DEPARTMENT agrees to pay the HMO monthly payments based on the HMO's decisions concerning optional services and reinsurance as specified in Addendum VI at the capitation rates established for counties within the identified regions as outlined in ADDENDUM XV. Capitation rates are calculated on an actuarial basis recognizing payment limits set forth in 42 CFR 447.361. Capitation payments received shall be payment in full for services provided by the HMO and there shall be no adjustments retroactively to reflect the actual cost of services provided.

**Fiscal years 2000, 2001, and 2002**

In consideration of Contract Services rendered by the HMO, the Department shall make a monthly capitated payment to the HMO. The monthly capitated payment will be established based on the Enrollee's age, sex and county of residence as established in Addendum XII. Capitation rates calculation methodology is outlined in Addendum XII.

**Fiscal year 2003**

In consideration of Contract Services rendered by the MCO [managed care organization], the Department shall make a monthly capitated payment to the MCO. The monthly capitated payment will be established based on the Enrollee's age, sex and county of residence as established in Addendum XI. Capitation rate calculation methodology is outlined in Addendum XI.

**Fiscal years 2004 and 2005**

In consideration of Contract Services rendered by the MCO, the Department shall make a monthly capitated payment to

the MCO. The monthly capitated payment will be established based on the Enrollee's age, sex and county of residence as established in Addendum XI. Capitation rate calculation methodology is outlined in Addendum XI.

In 2004 NevadaCare did not receive a new actuary report from DHS relating to the calculation of the fiscal year 2005 capitation rates. NevadaCare contacted DHS and requested the report but was told that there was no need for a new report because the capitation rates would not be changed for the upcoming fiscal year. From this point, the relationship between NevadaCare and DHS started to deteriorate. NevadaCare began to believe DHS was not properly setting the capitation rates and requested information about DHS's rate-setting practices; however, DHS did not comply with its requests. Thus, on October 6, 2004, NevadaCare filed an action alleging, in part, that DHS had violated the contracts at issue, as well as state and federal law, by setting improper capitation rates. Specifically, NevadaCare claimed DHS did not calculate the capitation rates on an actuarially sound basis. On November 29, 2004, NevadaCare exercised its option to terminate the fiscal years 2004 through 2005 contract with DHS. Due to a contractually required sixty-day notification period, the effective date of the termination was February 1, 2005. We will discuss other facts pertinent to deciding this appeal later in this opinion.

After dealing with extensive pretrial motions, the district court held a bench trial. In its decision, the district court concluded it could find no breach of the contracts since both parties performed pursuant to the specific capitation rates contained within the rate charts of the contracts. NevadaCare filed a motion to enlarge and amend the district court's findings of fact, conclusions of law, ruling, and judgment. The district court denied NevadaCare's motion.

In its final judgment on the merits, the district court gave the parties thirty days to present any claims for attorney fees and expenses. DHS filed an application for attorney fees and litigation costs as well as a supporting brief and affidavit. DHS claimed each contract, except the fiscal year 1998 contract, contained provisions entitling DHS to attorney fees and litigation costs. DHS requested the district court to award reasonable and necessary attorney fees and expenses in the amount of $2,987,757.41 and court costs taxed in the amount of $7,877.82.

NevadaCare resisted DHS's application for attorney fees and litigation costs. NevadaCare argued DHS had no basis to recover attorney fees related to the fiscal years 1999 through 2003 contracts because those contracts only contained indemnification provisions and did not contain explicit fee-shifting provisions. Consequently, NevadaCare sought to reduce DHS's reasonable and necessary attorney fees and costs to $366,931.49.

In ruling on DHS's application for attorney fees and litigation costs the district court concluded the indemnification provisions as well as the fiscal years 2004 to 2005 fee-shifting provision required NevadaCare to pay for the litigation expenses and attorney fees DHS had incurred in this case. As a result, the court granted DHS's application and ordered NevadaCare to pay DHS $1,942,912.20 in attorney fees and litigation expenses. After receiving this ruling, NevadaCare filed its notice of appeal.

## II. Issues.

We must decide if the district court properly interpreted the contracts. In doing so, we must determine if the contracts required DHS to calculate the capitation rates on an actuarially sound basis. After interpreting the contracts, we must next determine if substantial

evidence supports the district court's judgment. Finally, we must determine whether the district court correctly awarded DHS its attorney fees and litigation expenses under the contracts.

### III. Analysis.

### A. The Capitation Rates Issue.

1. *Standard of review.* A breach-of-contract claim tried at law to the district court is reviewed by us for correction of errors at law. *EnviroGas, L.P. v. Cedar Rapids/Linn County Solid Waste Agency*, 641 N.W.2d 776, 780 (Iowa 2002). The district court's findings of fact have the effect of a special verdict. Iowa R. App. P. 6.907 (2009). "The trial court's 'legal conclusions and application of legal principles are not binding on the appellate court.' " *EnviroGas, L.P.*, 641 N.W.2d at 781 (quoting *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000)). We will reverse a district court's judgment if we find the court has applied erroneous rules of law, which materially affected its decision. *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995). In contrast, the district court's findings of fact are binding on us if they are supported by substantial evidence. *Id.*

In this case, NevadaCare urges us to apply a more exacting standard when reviewing the district court's judgment, due to the district court's alleged wholesale adoption of DHS's proposed findings of fact and legal conclusions. Both parties filed proposed findings of fact and conclusions of law. It appears the district court's findings of fact quoted, essentially verbatim, from DHS's proposed findings of fact. Moreover, the district court's conclusions of law also quoted at length from DHS's proposed conclusions of law.

We have recognized counsels' submission of proposed findings of fact and conclusions of law can be extremely valuable in assisting the

district court, especially in highly technical or complicated cases. *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 435 (Iowa 1984). Nonetheless, we have criticized the practice of a district court's verbatim adoption of the proposed findings of fact and conclusions of law prepared by a prevailing attorney because "the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles." *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 266 (Iowa 2002); *see also United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–57, 84 S. Ct. 1044, 1047, 12 L. Ed. 2d 12, 17 (1964) (noting the court preferred findings "drawn with the insight of a disinterested mind" rather than counsel's proposed findings adopted verbatim by the trial court).

We have refused to adopt a higher standard of review under similar circumstances. *See Quality Refrigerated Servs., Inc. v. City of Spencer*, 586 N.W.2d 202, 205 (Iowa 1998); *Care Initiatives v. Bd. of Review*, 500 N.W.2d 14, 16 (Iowa 1993). We have recognized, however, where a district court adopts a prevailing counsel's proposed findings of fact and conclusions of law verbatim, we must scrutinize the record more carefully when conducting our appellate review. *Rubes*, 642 N.W.2d at 266. Accordingly, due to the district court's verbatim adoption of DHS's proposed findings of fact and conclusions of law, we will scrutinize the record more closely and carefully when performing our appellate review. *Id.*

We once again encourage our district courts not to adopt verbatim the proposed findings of fact and conclusions of law prepared by counsel. It is the district court's duty to independently determine the facts, articulate the controlling law, and apply the controlling law to the facts.

A court should never abdicate this essential duty of the judicial branch of government to counsel or the parties before the court.

2. *Principles of contract interpretation.* The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). If the principal purpose of the parties is ascertainable from the words and other conduct of the parties in light of all the circumstances, we give those words and conduct great weight when interpreting the contract. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). When interpreting the meaning of a contract we may also look to extrinsic evidence such as, " 'the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.' " *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Contracts § 212 cmt. *b*, at 126 (1979)). However, the most important evidence of the parties' intentions at the time they entered into the contract is the words of the contract. *Pillsbury Co.*, 752 N.W.2d at 436.

3. *Application of contract principles.* Although the language of the contracts dealing with the capitation rates varies from year to year, we interpret the contracts as requiring the capitation rates to be set on an actuarially sound basis. We reach this conclusion for the following reasons. First, all the contracts contain language that indicates the capitation rates were to be computed on an actuarially sound basis. The contracts for fiscal years 1998 and 1999 specifically require the capitation rates to be set on an actuarial basis. Even though the contract for fiscal years 2000 to 2002 does not include a reference to actuarial basis in the paragraph concerning the capitation rates,

addendum XII to the contract states, "[c]alculation of the SFY 2000 HMO rate setting was based on program and policy adjustments and trend adjustments applied to the analysis performed in setting the SFY 1999 rates." This sentence indicates Milliman calculated the capitation rates in this contract the same way it calculated the rates in the contract for fiscal year 1999. Finally, addendum XI to the contract for fiscal year 2003 specifically refers to "the actuarial soundness of the rates," while addendum XI to the contract for fiscal years 2004 and 2005 contains a certification acknowledging Milliman calculated the rates by following "generally accepted actuarial principles and practices."

Second, both federal and state law requires the capitation rates to be computed on an actuarially sound basis. *See* 42 U.S.C. § 1396b(m)(2)(A)(iii) (1992) (requiring payments to be made on an actuarially sound basis); 42 C.F.R. § 438.6(c)(2) (2001) (same); 42 C.F.R. § 434.61 (1996) (requiring CMS to determine that the capitation rates are computed on an actuarially sound basis); Iowa Admin. Code r. 441—88.12(2) (requiring capitation rates to be actuarially determined for the beginning of each new fiscal year). DHS hired an actuarial firm to compute the rates. In some of the contracts, the parties cited the applicable federal regulations. Both parties were versed in Medicaid law, recognized their dealings involved the Medicaid program, and understood that any contract must comply with the applicable law for setting capitation rates. There is no reason to believe both parties would have intended to enter into a contract that did not comply with the applicable Medicaid regulations.

The district court interpreted the contracts as contracts for the specific rates contained in the charts attached to each contract. We disagree with the district court's interpretation by finding the contracts

required the capitation rates contained in the charts to be computed on an actuarially sound basis.

4. *Substantial evidence of actuarially sound capitation rates.* Normally, we would be required to remand the case to the district court to decide if the capitation rates were computed on an actuarially sound basis. However, the district court found, even if there was a contractual promise requiring the rates to be actuarially sound, "the concept of actuarial soundness is, as an actuarial matter, susceptible [to] a wide range of appropriate capitation rates in any given situation and multiple methodologies for calculating those rates." The district court further found NevadaCare failed to carry its burden of proof that the rates contained in the charts attached to the contracts were not actuarially sound. In other words, the district court found NevadaCare did not establish that the capitation rates were not computed on an actuarially sound basis. Therefore, we need not remand the case; rather, we can review the record to determine whether substantial evidence supports the district court's finding that NevadaCare did not establish the capitation rates were not computed on an actuarially sound basis.

In arguing the capitation rates were not computed on an actuarially sound basis, NevadaCare presented testimony from two consulting actuaries. These actuaries spent considerable time reviewing and reconstructing the Milliman reports. The consulting actuaries took the data DHS provided Milliman and recalculated the capitation rates based on their own assumptions and judgments to obtain rates that they opined were actuarially sound.

The first area of concern addressed by the consulting actuaries involved the inclusion of certain data when determining the capitation rates for fiscal years 2004 and 2005. The consulting actuaries

determined Milliman improperly used data from foster care children claims, dental claims, and three-legged claims[1] in determining the capitation rates for fiscal years 2004 and 2005. The error in using foster care claims and dental claims data to compute actuarially sound capitation rates was that NevadaCare did not cover those claims. The error in using three-legged claims data to compute actuarially sound capitation rates was that Milliman did not properly account for the refund portion of these claims when it calculated the actual cost of the claims. The consulting actuaries concluded that by using this data, the capitation rates set in fiscal years 2004 and 2005 could not be actuarially sound. They determined these errors caused DHS to pay NevadaCare approximately six million dollars more than it should have been paid if the correct data had been used to set the capitation rates for those years.

At trial, the actuary for Milliman who oversaw the preparation of the reports acknowledged that the foster care children claims, dental claims, and three-legged claims data should not have been included when Milliman prepared the reports. He further testified the inclusion of this data did not affect the actuarial soundness of the capitation rates. DHS also had its own consulting actuary testify regarding the Milliman reports. As to using the data from foster care children claims, dental claims, and three-legged claims, the consulting actuary agreed that Milliman should not have used this data when it set the capitation rates for fiscal years 2004 and 2005. He did point out, however, that this six million dollar error was in favor of NevadaCare; therefore, it was a nonissue.

---

[1] A three-legged claim is a claim that was paid, refunded, and then repaid at a different reimbursement rate.

Based on this testimony, substantial evidence supports a finding that the capitation rates for the fiscal years 2004 to 2005 contract were not calculated on an actuarially sound basis. However, this breach does not entitle NevadaCare to recover damages. An essential element of a breach of contract claim is that the breach caused a party to incur damages. *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 657–58 (Iowa 2008). The inclusion of this data caused NevadaCare no damage. Consequently, NevadaCare cannot base a claim for breach of contract upon the inclusion of this data.

Nevadacare also claimed the capitation rates were not actuarially sound in eleven additional respects. Its consulting actuaries opined that the areas responsible for the unsoundness are (1) errors in encounter data, (2) calculation of claims incurred but not received, (3) inadequate legislative adjustment for tobacco settlement proceeds, (4) trending that does not reflect actual experience, (5) demographic changes, (6) reduction for co-pays not taken, (7) below cost administrative allowance, (8) inappropriate lag on payment, (9) inadequate MediPASS savings, (10) maternity adjustments errors, and (11) reinsurance issues. The basis for the consulting actuaries' opinions is that the adjustments made by the Milliman actuaries in these eleven areas were not in conformance with generally accepted actuarial principles. NevadaCare's consulting actuaries further opined that the method they used to calculate the capitation rates is the only way to determine the capitation rates on an actuarially sound basis.

DHS's actuarial experts opined that in each of the eleven areas, any adjustments made by the Milliman actuaries were dependent on the judgment of the actuaries. They also opined that any adjustments made

by the Milliman actuaries were in conformance with generally accepted actuarial principles.

When we review a finding for substantial evidence, we view the evidence in a light most favorable to the district court's judgment. *EnviroGas, L.P.,* 641 N.W.2d at 781. " 'Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion.' " *Land O'Lakes, Inc.,* 610 N.W.2d at 522 (quoting *Falczynski,* 533 N.W.2d at 230). "Evidence is not insubstantial merely because we may draw different conclusions from it[.]" *Raper v. State,* 688 N.W.2d 29, 36 (Iowa 2004). The ultimate question is whether the evidence supports the court's finding, not whether it would support a different finding. *Id.*

The testimony provided by DHS's actuarial experts constitutes substantial evidence that the capitation rates were determined on an actuarially sound basis. Actuarial science is a discipline that assesses risk in the insurance industry based upon the application of mathematical and statistical methods. It is not an exact science. An actuary must have an understanding of math, probabilities, statistics, finance, and economics. An actuary does not just crunch numbers. Rather, an actuary reviews data, analyzes its significance, and makes certain judgments relating to adjustments that need to be made to the data before the actuary can assess the insurance risks and set insurance premium rates. Different assumptions and judgment calls concerning the data made by different actuaries will lead to different risks and premium rates. Just because two actuaries determine different premium rates by analyzing the same set of data does not mean the premiums were not determined on an actuarially sound basis by both actuaries. As long as the differences are caused by assumptions and judgment calls

made by the actuaries in accordance with generally accepted actuarial standards and principles, the final rates calculated by the actuaries are computed on an actuarially sound basis. *See* Actuarial Standards Board, *Introduction to the Actuarial Standards of Practice* § 4.5.3 (2008) (recognizing it is appropriate, if not inevitable, for actuaries to exercise their professional judgment when projecting the effect of contingent future events).

Here, there is substantial evidence that the judgments and assumptions used by the Milliman actuaries would not have been the same as those used by the consulting actuaries hired by NevadaCare. Nevertheless, substantial evidence supports the finding that the judgments and assumptions made by the Milliman actuaries were in accordance with generally accepted actuarial standards and principles. Accordingly, we affirm the judgment of the district court that NevadaCare has failed to prove the capitation rates contained in the five contracts were not determined on an actuarially sound basis.

**B. Other Contractual Claims.** NevadaCare raises three further claims for reversal based on the district court's interpretation that the contracts were contracts for the capitation rates contained in the charts attached to each contract, rather than contracts requiring the rates to be computed on an actuarially sound basis. First, NevadaCare claims DHS breached the covenant of good faith because the contracts did not comply with the legal requirement that the capitation rates be computed on an actuarially sound basis. Second, NevadaCare claims the contracts should be reformed so that the rates are computed on an actuarially sound basis. Third, NevadaCare claims the law of promissory estoppel requires the contracts to be interpreted so that the rates are computed on an actuarially sound basis.

We have interpreted the contracts as requiring that the rates be computed on an actuarially sound basis. Therefore, we need not address these issues in this appeal.

### C. Attorney Fee Award.

1. *Standard of review.* We review a challenge to a district court's grant of attorney fees for an abuse of discretion. *City of Des Moines v. Housby-Mack, Inc.*, 687 N.W.2d 551, 554 (Iowa 2004); *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 541 (Iowa 1996); *Green v. Iowa Dist. Court*, 415 N.W.2d 606, 608 (Iowa 1987). We will reverse a court's discretionary ruling only when the court rests its ruling on grounds that are clearly unreasonable or untenable. *Gabelmann v. NFO, Inc.*, 606 N.W.2d 339, 342 (Iowa 2000). When reviewing an attorney fees award for an abuse of discretion, we will correct erroneous applications of the law. *Everly v. Knoxville Cmty. Sch. Dist.*, 774 N.W.2d 488, 492 (Iowa 2009).

2. *Analysis.* As a general rule, unless authorized by statute or contract, an award of attorney fees is not allowed. *W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003). Iowa Code section 625.22 authorizes a court to award reasonable attorney fees in an action where "judgment is recovered upon a written contract containing an agreement to pay an attorney's fee." Iowa Code § 625.22 (1997). A written contract must contain an express provision regarding attorney fees and litigation expenses in order for a court to include attorney fees and litigation expenses in a favorable judgment. *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 301 (Iowa 2000). When a contract contains a clear and express provision regarding attorney fees, the court's award must be for reasonable attorney fees. *Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 842 (Iowa 2007).

NevadaCare argues the indemnification provisions contained in the fiscal years 1999 through 2003 contracts did not entitle DHS to recover attorney fees; instead, the indemnification provisions only provided for the recovery of attorney fees and costs incurred in connection with third-party claims. DHS claims the court properly awarded the fees under the indemnification provisions in the contracts. The contract for fiscal year 2003 contained an indemnification provision that stated:

> The MCO agrees to defend, indemnify and hold the State of Iowa and the Department, and their officers, agents and employees, harmless from any and all liabilities, damages, settlements, judgments, costs and expenses, including reasonable attorney's fees of the Attorney General's Office, and the costs and expenses and attorney fees of other counsel required to defend the State of Iowa, the Department and their officers, agents and employees related to or arising from:
>
> • *Any breach of this Contract*;
>
> • Any negligent or intentional act or omission of the MCO, its officers, owners, employees, agents, board members, Providers or subcontractors or any other person in connection with the services provided under this Contract;
>
> • Claims for infringement of patents, trademarks, trade secrets, copyrights or other intellectual property right;
>
> • The MCO's performance or attempted performance of this Contract;
>
> • Any failure by the MCO to comply with all local, state and federal laws and regulations;
>
> • Any failure by the MCO to make all reports and any payments required to conduct business in the State of Iowa, including, but not limited to, federal and state withholding; taxes; and other fees or costs required of the MCO; or
>
> • Any failure by the MCO to adhere to the confidentiality provisions of this Contract.

(Emphasis added.) The fiscal years 1999, 2000 to 2002, and 2004 to 2005 contracts contain substantially similar indemnification provisions. The contracts for fiscal years 1999 through 2003 did not contain specific fee-shifting provisions.

Currently, there is a split of authority as to whether an indemnification provision applies to claims between the parties to the agreement or only to third-party claims. Some jurisdictions have held attorney fees are recoverable under a general indemnity provision. *See, e.g.*, *Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 216 (1st Cir. 2006) (holding Massachusetts law contains no assumption that indemnity provisions are restricted to third-party claims); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1031–32 (9th Cir. 1992) (finding the plain meaning of "indemnify" is not to compensate for losses caused by third parties, but merely to compensate for loss in general); *Kraft Foods N. Am., Inc. v. Banner Eng'g & Sales, Inc.*, 446 F. Supp. 2d 551, 577 (E.D. Va. 2006) (stating "the plain meaning definition of indemnification does not limit reimbursement to losses suffered as a result of third party claims"); *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 288–89 (Md. 2008) (citing jurisdictions that have interpreted indemnity provisions to include first-party attorney fees); *Coady v. Strategic Res., Inc.*, 515 S.E.2d 273, 275–76 (Va. 1999) (finding the terms of the indemnification provision were broad and all-encompassing and allowed for the payment of attorney fees between the parties).

Other jurisdictions have found indemnification provisions do not authorize the award of attorney fees with regard to claims between the parties to the agreement because indemnification provisions only apply to third-party claims. *See, e.g.*, *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 198–200 (2d Cir. 2003) (holding under New York law,

indemnification provision only applied to third-party suits and thus, did not authorize award of attorney fees between parties to the contract); *Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1115 (D. Utah 2005) (holding the use of the word "defend" in the indemnification provision indicates the parties intent for the provision only to apply to third-party claims); *Nova Research, Inc.*, 952 A.2d at 284–85, 287–89 (stating whether or not indemnification provision covers fees incurred in third-party litigation or also covers fees incurred in litigation between the parties themselves is a matter of contract interpretation, and ultimately holding provision was not intended to cover first-party attorney fees as well as citing numerous jurisdictions that have reached a similar conclusion); *Colonial Pipeline Co. v. Nashville & E. R.R.*, 253 S.W.3d 616, 624 (Tenn. Ct. App. 2007) (holding indemnity provision applied only to suits brought by third parties because applying the provision to a dispute between the contracting parties would yield an absurd result).

In Iowa, we have held an indemnification clause that uses the terms "indemnify" and "hold harmless" indicates an intent by the parties to protect a party from claims made by third parties rather than those brought by a party to the contract. *Estate of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344–45 (Iowa 2005). Therefore, a party to a contract cannot use an indemnity clause to shift attorney fees between the parties unless the language of the clause shows an intent to clearly and unambiguously shift the fees. *Cf. McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 571 (Iowa 2002) (holding "indemnification contracts will not be construed to permit an indemnitee to recover for its own negligence unless the intention of the parties is clearly and unambiguously expressed").

The district court found the phrase, "Any breach of this Contract," and similar language contained in the other indemnity provisions allowed the award of attorney fees for the 1999 through 2003 contracts. We do not believe this language or any other language in the 1999 through 2003 contracts shows clearly and unambiguously an intent by the parties to shift the attorney fees incurred in a breach of contract action between the parties. Under these contracts, NevadaCare was required to contract with physicians to provide medical services to Medicaid recipients. NevadaCare was responsible for reimbursing the physicians for their services. If a physician claimed a breach of duty by DHS, the Medicaid provider, the potential existed for the physician to sue DHS. If DHS was sued and the disagreement between Medicaid and the physician was caused by NevadaCare's breach of the contract between NevadaCare and DHS, this provision of the contract would indemnify DHS for "any and all liabilities, damages, settlements, judgments, costs and expenses, including reasonable attorney's fees of the Attorney General's Office, and the costs and expenses and attorney fees of other counsel required to defend" DHS.

Furthermore, the addition of an explicit fee-shifting provision in the contract for fiscal years 2004 and 2005 supports a finding that the parties did not clearly and unambiguously intend the indemnity provisions in the 1999 through 2003 contracts to shift the attorney fees between the parties. From fiscal year 1999 forward, each contract entered into by the parties had substantially similar indemnification provisions. The contract for fiscal years 2004 and 2005, however, had an explicit fee-shifting provision. It provided:

> In the event the state agency should prevail in any legal action arising out of the performance or non-performance of

> the contract, the Health Plan shall pay, in addition to any damages, all expenses of such action including reasonable attorney's fees and costs. The term "legal action" shall be deemed to include any administrative proceedings, as well as all actions at law or equity.

If the indemnification provisions in the contracts for fiscal years 1999 through 2005 were intended by the parties to be fee-shifting provisions, there would be no reason for the parties to include a specific fee-shifting provision in the contract for fiscal years 2004 and 2005.

Therefore, the language used in the indemnity clauses in the 1999 through 2003 contracts does not clearly and unambiguously evidence an intent by the parties to shift the attorney fees between the parties. As a result, the district court's award of attorney fees based on the indemnification provisions contained in the contracts for fiscal years 1999 to 2003 was error.

The contract for fiscal years 2004 and 2005 does have an enforceable fee-shifting provision. The party seeking to recover such fees must prove that the services were reasonably necessary and the charges were reasonable in amount. *Ales*, 728 N.W.2d at 842; *Green*, 415 N.W.2d at 608. Therefore, we reverse the judgment of the district court awarding attorney fees under the contracts for fiscal years 1999 through 2003. We remand the case to the district court to determine a reasonable amount of attorney fees and litigation costs for the services reasonably necessary to defend the contract for fiscal years 2004 and 2005 in the district court and on appeal.

## IV. Disposition.

We affirm the judgment of the district court granting judgment in favor of DHS on all claims on the merits. We reverse the judgment of the district court awarding attorney fees and litigation costs in favor of DHS and remand the case to the district court for further proceedings to

determine an appropriate award of attorney fees and litigation costs limited to the contract for fiscal years 2004 and 2005. We assess costs on appeal equally between the parties.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**