# IN THE COURT OF APPEALS OF IOWA

No. 19-1978
Filed February 3, 2021

**RICHARD J. ERWIN,**
　　　　Plaintiff-Appellant/Cross-Appellee,

**vs.**

**MICHAEL G. ERWIN and ERWIN FARMS II, LLC,**
　　　　Defendants-Appellees/Cross-Appellants.
_____

　　　　Appeal from the Iowa District Court for Warren County, Martha L. Mertz, Judge.


　　　　Richard J. Erwin appeals, and Michael G. Erwin and Erwin Farms II, LLC cross-appeal, the district court's orders regarding the management and administration of Erwin Farms II, LLC.  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


　　　　Elizabeth R. Meyer, Sarah K. Franklin, and Lucas B. Draisey (until withdrawal) of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

　　　　Brant D. Kahler and James W. White of Brown, Winick, Graves, Gross & Baskerville, P.L.C., Des Moines, for appellees.


　　　　Heard by Bower, C.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Richard J. Erwin (R.J.) appeals, and Michael G. Erwin (Mike G.) and Erwin Farms II, LLC (Erwin II) cross-appeal, the district court's orders regarding the management and administration of Erwin II. R.J. argues Michael breached his fiduciary duties as the manager of Erwin II and appeals the district court's findings regarding damages and injunctive relief. Mike G. cross-appeals and agues there was no breach of fiduciary duties, he is entitled to injunctive relief, and the district court's findings regarding a skid loader are errant.[1]

## I.    Background Facts and Proceedings

Mike G. and his wife, Janet, (Erwins) own land used for farming in Warren County. In an effort to create an estate plan to pass to their adult son, R.J., a portion of the land without incurring tax liability, they created Erwin II in 2012 and transferred ownership of the Turner Farm to the LLC by warranty deed, without the deed reciting the transfer was subject to any mortgage. Prior to the transfer, the Turner Farm had been encumbered by a mortgage to secure a note or notes that had been incurred in connection with the farming operation and/or the purchase of the land. It is clear the Erwins used the farm income as a source for payments on the obligation under the note or notes. It is also obvious the Erwins intended the farm to continue to be a source for payments toward the obligation. After the creation of the LLC and the transfer of the Turner Farm to it, the Erwins gifted to

---

[1] R.J. failed to cite any supporting legal authority for his argument related to Mike G.'s counterclaim. Mike G. failed to cite any supporting legal authority for his arguments related to the skid loader, donations to college savings accounts, and the counterclaim arguing damages based on income distributions were errant. We deem these arguments waived. Iowa R. App. P. 6.903(2)(g)(3).

R.J. 500,000 membership units when he signed an acknowledgement of the operating agreement in December 2012. "[R.J.]'s interest is all Class B non-voting membership units. [The Erwins], who own the remaining 500,000 membership units, own part Class A voting membership units and part Class B non-voting membership units."[2]

Erwin II is governed by an operating agreement naming Mike G. the manager. "The Operating Agreement contains terms regarding membership interests, the Company's purpose, management, distributions, accounting, reports, and similar provisions." Erwin II's largest asset is the Turner Farm. Since the transfer of the Turner Farm to the LLC, "the Erwins twice took out loans for improvements to the land."

> Between the creation of Erwin II in December 2012 and the end of 2016, Mike G., as manager of Erwin II, used income generated by Erwin II to pay off indebtedness associated with the Turner Farm or to reimburse him and Janet for their personal funds used to pay such debts. Mike G. and Janet did not refinance the property when they created Erwin II, so the mortgage and notes remained in the Erwins' names. At the time of trial, the property owned by Erwin II was debt free.
> . . . . Mike G., like many farmers, often handled the farm operation with little attention to paperwork details. He did not treat his farm income as separate from other income and made deposits and paid expenses from his personal bank account. Until the end of the first year Erwin II was in operation, it never occurred to Mike G. the Company should have a separate bank account. It would not have occurred to him then, except his tax advisor "strongly suggested" Mike G. separate his personal income from Erwin II income.

---

[2] All quotations contained in this section are to the district court's April 11, 2019 ruling.

The Erwins' tax accountant discovered Mike G. was commingling personal and Erwin II funds in 2013, and that they had also been commingled with funds from Erwin Farms I, LLC, a company established for the benefit of another child.

Mike G. tried to remedy the 2013 tax issues created by commingling funds by "[giving] R.J. a check for approximately $32,000.00 and insisted that R.J. give the money back in two equal checks, one to Mike G. and one to Janet." R.J. complied with the request and began to request financial records for Erwin II from Mike G. and the attorney who helped the Erwins establish Erwin II. R.J. never received the information and ultimately filed the lawsuit leading to this appeal.

R.J. and Mike G. established an oral crop-share lease agreement for the Turner farm shortly before the creation of Erwin II. "R.J. got 70% of the crop income and paid all the input expenses. While the Erwins only got 30% of the income, they only paid for crop insurance and trucking expenses. . . ."[3] They also had an oral agreement for R.J. to cash rent hay and pasture land from Erwin II. However, when Mike G. received notice of the lawsuit, he terminated R.J.'s lease. The termination "made it impossible for R.J. to comply with the terms of a purchase agreement [for livestock] he had made with Mike G." and forced him to sell the livestock at a loss. Mike G. also "placed the land leased to R.J. in the Conservation Reserve Program [(CRP)] before R.J.'s lease expired and without R.J.'s consent. Because the Farm Service Agency (FSA) knew R.J. was the tenant, Mike G. needed R.J.'s consent to put the land in CRP." Mike G. used a power of attorney

---

[3] The district court was no doubt reciting what happened, even though at the time it was Erwin II that should have received the 30% income and paid the expenses.

executed in 2002 as authority to enter into the CRP contract.  Since that time, the FSA "concluded the CRP contract was valid."

Trial was held in July and August 2018.  The district court ruling was issued in April 2019.  Both parties filed motions to reconsider pursuant to Iowa Rule of Civil Procedure 1.904(2).  The district court denied the motions and declined to award attorney fees to either party.

## II.     Standard of Review

This case was tried in equity, so our review is de novo.  Iowa Rule App. P. 6.907.  "In equity cases, we are not bound by the district court's factual findings; however, we generally give them weight, especially with regard to the credibility of witnesses."  *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011).

We review awards of attorney fees for an abuse of discretion.  *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010).  An award will be reversed only on "grounds that are clearly unreasonable or untenable."  *Id.*

## III.    Discussion

### A.     Personal Debt Payments

R.J. argues the district court erred in finding Mike G. did not breach fiduciary duties or the operating agreement when he used Erwin II funds to pay personal debts related to the Turner Farm.  His argument insists the Turner Farm debt was personal debt, not company debt, even though ownership of the property was transferred to Erwin II.  Mike G. argues the district court's finding that no breach occurred when Erwin II funds were used to pay debts that encumbered company property was correct.

Duties of loyalty and care are statutorily imposed upon managers of limited liability companies. Iowa Code § 489.409(1) (2016). The duty of loyalty requires managers "a. To account to the company and hold as trustee for it any property, profit, or benefit derived by the members . . . ," "b. to refrain from dealing the with company in the conduct or winding up of the company's activities as or on behalf of a person having an interest adverse to the company," and "c. To refrain from competing with the company in the conduct of the company's activities before dissolution of the company." *Id.* § 489.409(2). A defense to the duty of loyalty may be raised claiming "the transaction was fair to the limited liability company." *Id.* § 489.409(5). The duty of care requires managers

> in the conduct and winding up of the company's activities [] to act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the member reasonably believes to be in the best interests of the company. In discharging this duty, a member may rely in good faith upon opinions, reports, statements, or other information provided by another person that the member reasonably believes is a competent and reliable source for the information.

*Id.* § 489.409(3). A manager may raise a defense to a claim for breach of the duty of care pursuant to the business judgment rule. If a plaintiff can make a prima facie case showing a manager engaged in self-dealing, the burden of proof shifts to the manager. If the manager can provide evidence of "good faith, honesty, and fairness," the business judgment rule provides a presumption that a manager's "decisions are informed, made in good faith, and honestly believed by them to be in the best interests of the company." *Cookies Food Prods., Inc., by Rowedder v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 453 (Iowa 1988).

R.J.'s argument cites to three alleged violations of the operating agreement. Section 2.1 states, "The Company shall hold all of its Property in the name of the Company and not in the name of any Interest Holder or Manager." Section 4.1(k) directs the manager

> [t]o open accounts and deposits and maintain funds in the name of the Company in banks or savings and loan associations insured by the Federal Deposit Insurance Corporation or Federal Savings and Loan Insurance corporation; provided, however, that the Company's funds shall not be commingled with the funds of any other Person.

Section 4.11 also makes directions to the manager.

> Fiduciary Duty. The Managers shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company, including the safekeeping of all Property and the use thereof for the exclusive benefit of the Company. The Company shall not enter into any transaction with the Managers or Affiliates of the Managers unless it is in the ordinary course of Company business, is beneficial to the Company, and is on terms that would be competitive with those which could be obtained if the transaction were entered into with a non-affiliate.

R.J. argues Erwin II never incurred liability to pay the mortgage debt on the Turner Farm. "It is a well-settled rule of law that where property is conveyed subject to an existing mortgage, the grantee is not liable for the payment of such a mortgage." *Des Moines Joint Stock Land Bank of Des Moines v. Allen*, 261 N.W. 912, 915 (Iowa 1935). But, a "court, sitting in equity, has considerable flexibility in resolving [a] dispute" among members and managers of limited liability companies. *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 677–78 (Iowa 2013). "In fashioning appropriate remedies, we have explained that trial courts should regard requests for general equitable relief with considerable liberality. We caution, however, that courts must be careful when determining relief to avoid giving the minority a foothold that is oppressive to the majority." *Id.* at 678–79.

The fact that there was a mortgage on the Turner Farm when the deed was transferred to Erwin II is not in dispute. The debt pre-existed creation of the company. There is also no dispute that none of the deeds executed nor the operating agreement state the encumbrance. Debt service for the Turner Farm, and presumably all the farming operations, was historically derived from the Turner Farm and other farm property. There is little doubt that when the Erwins created Erwin II they intended income from the LLC would service the debt associated with the Turner Farm. R.J. was not one of the initial shareholders in the LLC and thus was not a party to the initial transactions creating Erwin II and capitalizing it with Turner Farm. His legal interest in Erwin II occurred later as a result of shares that were gifted to him after the formation of Erwin II and the transfer of the Turner Farm to it.

Each alleged statutory and contractual breach is based on the assumption that Mike G. harmed Erwin II. Yet, the record reveals that the reinvestment of Erwin II financial assets back into the company was a benefit to the company, and even directly to R.J. personally. In fact, the statutory defenses and applicable contractual provisions contain exceptions to the rules allowing a manager to take otherwise barred actions that benefit the company. Mike G. paid the mortgage on the Turner Farm to maintain ownership of the property and, eventually, leave it to R.J. with a minimal tax liability. The facts of this case establish that Mike G.'s conduct reinvesting Erwin II financial assets by paying the Turner Farm mortgage was done in good faith and for the benefit of Erwin II and R.J. In effect, R.J.'s complaint is that if Erwin II was paying the mortgage and other debt associated with the Turner Farm, he did not receive as much value from the Turner Farm as

he thought he was gifted or should have been gifted. Given the undisputed facts of the history of the Turner Farm and the creation of Erwin II, we find no inequity in the Turner Farm income being used to pay the debts arising out of the Turner Farm purchase and operating loans.

B.      Tax Returns and Financial Information

R.J. argues Mike G. breached the operating agreement by filing inaccurate tax returns from 2013 through 2015 and failing to produce financial information upon R.J.'s request. Mike G. and Erwin II argue the district court's findings were correct.

Again, R.J. points to three provisions of the operating agreement that have allegedly been breached. Section 9.1 requires the manager to maintain "true and full financial records and books of account." Section 9.2 instructs the manager to keep said books at the principal office and that members "upon reasonable notice to the Managers, shall have access to such books, records, and documents during reasonable business hours and may inspect and make copies of them." Section 9.5 requires the manager to create annual financial reports and file tax returns.

The parties had separate experts testify regarding the income taxes prepared for Erwin II. The accountant who prepared the taxes also testified. The district court found the following.

> Mike G. failed to establish a bank account for Erwin II for over a year. In the meantime, he deposited Erwin II income to his personal bank account and paid Erwin II expenses from the same account. Mike G. failed to maintain separate bookkeeping records for Erwin II. In addition, he did not prepare annual reports as required by the Operating Agreement.

The district court classified these failures as omissions and discussed the big-picture function of the company as an estate-planning device. The court appeared to be lenient regarding the use of the Erwin's personal bank account because they funded the operation and then used the account for income and expenses. The court also noted Mike G.'s limited understanding of his full duties as manager of Erwin II and learning process throughout the course of proceedings.

This court agrees with the list of duties Mike G. failed to perform as the manager of Erwin II. Both parties could have avoided this litigation if Mike G. had read the operating agreement and worked with his attorney to fully understand the details when Erwin II was created in 2012. "A failure to fully ready and consider the contract cannot relieve [a party] of its provisions." *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 28 (Iowa 2013) (quoting *Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486 (Iowa 1999)). But there is no evidence in the record that Mike G. acted to harm Erwin II in these activities. His purpose was to preserve the company's assets for R.J. We also agree that, in these practices, Mike G. was acting in good faith to do what he believed was best for Erwin II.

Mike G. worked with an accountant to prepare tax returns for Erwin II. There is no evidence that Mike G. did more than provide certain records to the accountant for preparation of the income tax returns. There is no provision of the operating agreement or Iowa Code barring a manager of a limited liability company from relying in good faith on a tax professional.

Section 9.2 of the operating agreement instructs a manager to provide financial records to a member "upon reasonable notice." That duty is also required pursuant to Iowa Code section 489.10(2)(b).

b. During regular business hours and at a reasonable location specified by the company, a member may obtain from the company and inspect and copy full information regarding the activities, financial condition, and other circumstances of the company as is just and reasonable if all of the following apply:

(1) The member seeks the information for a purpose material to the member's interest as a member.

(2) The member makes a demand in a record received by the company, describing with reasonable particularity the information sought and the purpose for seeking the information.

(3) The information sought is directly connected to the member's purpose.

c. Within ten days after receiving a demand pursuant to paragraph "b", subparagraph (2), the company shall in a record inform the member that made the demand all of the following:

(1) Of the information that the company will provide in response to the demand and when and where the company will provide the information.

(2) If the company declines to provide any demanded information, the company's reasons for declining.

Iowa Code § 489.410(2)(b), (c).

R.J. requested a copy of the operating agreement, financial records, and tax information for Erwin II via email on February 23, 2016. That email exchange also included the attorney who worked with the Erwins to establish the company. As the email exchange continued, R.J. repeated his request for documents on February 25 and 29 and March 1. R.J.'s language consistently identifies the documents he would like to access, satisfying section 489.10(2)(b)(2). The February 23 request also discusses the Turner Farm lease issue but does not state a precise purpose for all of the documents requested. R.J. made one statement related to the tax documents requested, "Need to figure out the issues with Taxes/IRS since none of this has been reported correctly on this whole mess. Meeting with accountant to figure out these details." However, rather than stating a "purpose material to [his] interest as a member," R.J.'s comment appears to be

directed at the status of his lease and not a concern that he may be exposed to tax liability. On Thursday, February 25, R.J.'s request said that if the documents are "not received by [Friday] night [R.J.] will hire attorney Monday to request them and schedule arbitration." Instead of stating a purpose with the February 25 request, R.J. threatened legal action. The February 29 request contained no language that could be construed as a purpose for the document request. R.J.'s March 1 email stated he would like to inspect and compare the records with his own records. Again, the language obviously requests the documents, but does not give a purpose for the inspection and comparison. On our review of the record, we agree with the district court that R.J's requests for the records failed to comply with the statutory requirements of Iowa Code section 489.10(2)(b).

C.      Removal of the Manager

R.J. argues the district court erred in failing to remove Mike G. from the role of manager of Erwin Farms II. R.J. points to no statutory provision allowing the court to impose this remedy but argues that the failure to remove Mike G. would result in a failure of justice. *See Drennen v. Olmstead*, 224 N.W. 85, 85–86 (Iowa 1937). He cites one case involving minority shareholder oppression that discusses a district court's flexibility in imposing a remedy. *See Baur*, 832 N.W.2d at 677–78. Mike G. argues the only authority to remove a manager is as set out in the operating agreement and does not lie with the court. The operating agreement provides, "A Manager may be removed at any time by a majority vote of the Class A Members; provided, *however*, if there are no Class A Members, a Manager may be removed at any time by a majority vote of the Members."

The district court appointed a receiver to ensure statutory and contractual compliance for Erwin II through the course of proceedings. The court agreed with Mike G. that it lacked the authority to remove the manager pursuant to the terms of the operating agreement. The district court also stated it lacked removal authority because no party sought dissolution of the company pursuant to Iowa Code section 489.602. The district court's remedy was to retain jurisdiction of the issue, allow Mike G. to continue as manager, and impose reporting requirements followed by a compliance hearing to confirm his dedication to the role. The district court established clear expectations of Mike G. and invited the parties' attorneys to attend the compliance hearing if they desired. Our review of the record shows the district court exercised its flexibility in fashioning an equitable remedy for the issue.

D. Injunctive Relief

R.J. argues the district court erred in failing to order a permanent injunction barring Mike G. from breaching the operating agreement in the future. Mike G. argues that the issue is not ripe and that other legal remedies are available.

"A permanent injunction is a remedy that should be granted only with caution," but "is warranted when it is necessary to prevent irreparable injury to the plaintiff and when there is no other adequate remedy at law." *In re Langholz*, 887 N.W.2d 770, 779 (Iowa 2016). "A plaintiff who seeks a permanent injunction must establish '(1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy.'" *Id.* (quoting *City of Okoboji v. Parks*, 830 N.W.2d 300, 309 (Iowa 1999)). "Court[s] must weigh the relative hardship to each

party," and must be tailored to provide relief but "not [to] interfere with the legitimate and proper actions of the person against whom it is granted  A permanent injunction should only be ordered to prevent damage likely to occur in the future; it is not meant to punish for past damage." *Id.* 779–80.

R.J.'s request would require us to find that no other legal remedy exists. *Id.* at 779.  But, as R.J.'s argument regarding removal reveals, district courts, sitting in equity, have flexibility to create a remedy and that several options exist. *Baur*, 832 N.W.2d at 677–78 (listing cases and remedies).  The district court's remedy imposed specific duties on Mike G. to provide reports and comply applicable statues and the operating agreement.  His failure to do so would result in the district court exercising its retained jurisdiction to impose another remedy.  Because other legal remedies exist, injunctive relief is improper at this time.

E.    Damages

R.J. argues the district court erred in calculating damages.  He argues he is entitled to damages due to reliance on admittedly errant tax returns, missing income, alleged personal debt payments, management fees, and the CRP incident.  Mike G. contests these claims.  Speculative damages will be denied. *Miller v. Rohling*, 720 N.W.3d 562, 572 (Iowa 2006).

The district court awarded damages to R.J. in the amount of $47,866.00, the sum of annual distributions "he should have received as a member of Erwin II." The district court used income tax returns to reach the value of the annual distributions because they "are the only documents available to the Court and acknowledged by Defendant to show what ordinary income he received from Erwin

II." Our review of the record reaches the same conclusion regarding evidence of ordinary income and its use.

R.J. argues his damage award should include half of the income from allegedly lost grain. However, our review of the record reveals those funds were included in the district court's calculation of Erwin II's income on Attachment A to the district court's ruling. The funds were included with the label "plus Disputed Income."

R.J. argues he is entitled to half of the Erwin II funds used to pay allegedly personal debt. Based on our discussion of the debt related to the Turner Farm above, we reiterate that the funds were used to reinvest in the property, to pay the debt on the property to maintain the assets of Erwin II. No damage resulted.

R.J. also argues Mike G.'s poor performance as manager negates the necessity to pay the manager's fee pursuant to the operating agreement. Mike G. never took the 10% gross revenue fee the operating agreement entitles a manager to take. Based on testimony that the standard manager's fee is 6–7% and the court's discussion of Mike G.'s level of services provided, the fee was reduced to 4% for 2013 and 2014 and 6% for 2015. The manager's fee awarded to Mike G. was ultimately set off by the amount Mike G. was to reimburse Erwin II for donations made to college savings accounts. Mike G.'s performance was, in some situations, "dismally poor." However, prior to instigation of litigation, he worked to promote and maintain the assets of Erwin II. It is obvious that issues between father and son soured the relationship, but the company assets will, based on the record, perform their intended estate-planning purpose. Our review of the record reveals the district court properly exercised its discretion when it reduced the fees.

R.J. finally argues he is entitled to $2985.76 in damages for the four months lost due to Mike G.'s enrollment of the crop-share land in CRP. Mike G. argues the benefit of the agreement had already been realized because the four months of occupancy lost were after harvest and that the United States Department of Agriculture verified the validity of the CRP contracts. The record establishes that R.J. was deprived of occupancy for four months and Erwin II breached the lease as a result of Mike G.'s wrongful use of a power of attorney and his bad faith misconduct as manager. R.J. paid $8957.27 for the 51.52 acres and is entitled to damages payable by Mike G. in the amount of $2985.76 to refund him for the four months occupancy he lost due to Mike G.'s misconduct.

F.    Attorney Fees

R.J. argues the district court erred in failing to award him attorney fees as a partially prevailing party. Mike G. argues R.J. was not a prevailing party and is not entitled to an award. Parties to a contract may enter into "an agreement to pay an attorney fee." Iowa Code § 625.22. Section 11.14 of the operating agreement instructs that "the unsuccessful party or parties in [litigation arising from the operating agreement] shall pay to the prevailing party or parties all reasonable costs and expenses, including, without limitation, attorney fees and expenses, incurred by the prevailing party or parties in the action."

The district court found that both parties prevailed on certain aspects of their claims and, as members of Erwin II, were entitled to attorney fees. Mike G. breached duties imposed both by statute and the operating agreement. Mike G. also prevailed in the derivative action. Ultimately, the district court awarded no attorney fees to either party. It refused to create further financial burdens and add

more fuel to an already extensive and painful dispute between family members. On our review of the record, we find nothing clearly untenable or unreasonable about the district court's exercise of discretion regarding the attorney fee award. *See NevadaCare, Inc.*, 783 N.W.2d at 469.

Section 4.13 of the operating agreement grants a manager the right to indemnification for expenses paid,

> (including reasonable attorney fees and expenses) incurred by the Managers at any time by reason of or arising out of any act performed or omitted to be performed by the Managers on behalf of the Company or in furtherance of the interest of the Company, except for liability for bad faith . . . .

The indemnification also applies to successful defenses of derivative actions. The district court found it had no authority to determine whether Mike G. was entitled to indemnity and that the matter must be decided by the members of the LLC. The court found no ambiguity in the provision and that it could not modify the terms of the contract.

Our findings diverge from the district court's only regarding the CRP incident. The district court found Mike G. acted in bad faith but did not award any damages. We find the bad-faith conduct should result in a damage award to R.J. Bad faith is listed as an exception to the indemnification provision of the operating agreement. Because Mike G. acted in bad faith, we find he is not entitled to indemnification for attorney fees in this action.

## IV. Conclusion

On our de novo review of the record, we agree with the district court that Mike G. did engage in conduct that breached fiduciary duties and the operating agreement but agree with the remedy fashioned by the district court. We reverse

the district court regarding the CRP incident, finding that Mike G.'s admittedly purposeful conduct was in bad faith and award R.J. damages in the amount of $2985.76. We find no abuse of discretion in the district court's decision to decline any award of attorney fees. Finally, we find Mike G.'s bad-faith conduct regarding the CRP incident renders him ineligible for indemnification due to the clear terms of the operating agreement. We remand the matter to the district court for entry of an order consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**