# IN THE COURT OF APPEALS OF IOWA

No. 18-0918
Filed November 6, 2019

**NAPA VALLEY OWNERS ASSOCIATION,**
    Plaintiff-Appellee,

**vs.**

**JOHN BARTON GOPLERUD and LESLIE CLEMENSON,**
    Defendants-Appellants.
_____

Appeal from the Iowa District Court for Dallas County, Dustria A. Relph, Judge.

Defendants appeal district court orders enjoining use of and ordering removal of structures on residential property and an award of attorney fees. **AFFIRMED.**

Steven P. Wandro and Kara M. Simons of Wandro & Associates, P.C., Des Moines, for appellants.

Patrick B. White of White Law, P.C., Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and Mullins, JJ.

**MULLINS, Judge.**

John Barton Goplerud and Leslie Clemenson ("Gopleruds") appeal district court orders enjoining Lyle and Dorothy Hale ("Hales") from using an outbuilding on the Gopleruds' property as a residential dwelling; ordering removal of a shed, bridge, and concrete slab and restoration of the lot to pre-construction condition; and awarding attorney fees and costs to the Napa Valley Owner's Association ("Association"). The Gopleruds argue the district court erred in: (1) concluding they violated restrictive covenants because the Association (a) lacked authority to enforce the covenants and (b) unreasonably enforced the covenants, (2) ordering injunctive relief, and (3) awarding attorney fees to the Association.

## I. Background Facts and Proceedings

Napa Valley Estates is a residential housing development. In 1988, a declaration of covenants, conditions, and restrictions was recorded concerning the development. The declaration provided for the creation of the Association for the benefit of the owners and provided for a board of directors ("Board") to manage the affairs of the Association. The document also made provision for an architectural control committee ("ACC"), approval from which would be required before any owner would be allowed to erect or construct certain additions on any lot. All voting rights of the Association were retained by William Knapp. The Association was incorporated as a non-profit corporation in 1989. The Association established corporate bylaws in 1990.

In 2009, the declaration was restated and amended. The restated declaration included the following provision:

Section 6.    No building or structure of a temporary character and no trailer, basement, tent, shack, garage, or Outbuilding shall be used at any time as a residential dwelling on any Lot, either temporarily or permanently.

Notwithstanding the provisions of this Section 6 to the contrary, guest houses may be permitted in Outbuildings subject to rules and regulations of the Association and the approval of plans of such Outbuildings. *No guest house shall be used for permanent living quarters*, nor shall any guest house be allowed on a Lot which does not have a house erected.[1]

(Emphasis added.)   That same year, Knapp transitioned government of the Association to the Board, which is comprised of members elected by lot owners.

The Gopleruds are both experienced attorneys.  The Gopleruds purchased the home in Napa Valley Estates in 2003, with the understanding they were bound to keep the property in accordance with the development's covenants and that the development was governed by the Association.  In May 2014, the Gopleruds submitted an ACC application to build an outbuilding.  The outbuilding would function in part as a garage, and in part as a retirement residence for Clemenson's parents, the Hales.  As a part of the application through the Association's website, Clemenson was required to check a box stating she read and agreed to the declaration of covenants.  Clemenson also submitted general blueprints for the outbuilding and plans for a deck but did not include interior plans, nor did she indicate the building would be used as a permanent residence for the Hales.  The ACC approved the construction of the outbuilding.  At the time of application and approval, neither the ACC nor the Association were aware of the intended residential use.  The Hales consistently used the outbuilding as their residence by the end of January 2015.

---

[1] The original 1988 declarations contained the same provision.

In June 2015, the Association began to receive complaints about the Hales' residence in the outbuilding and the sloppy appearance of the Goplerud lot in general. Following the August Board meeting, a letter was sent to the Gopleruds. The August 13, 2015[2] letter asked for an appointment to allow the ACC to inspect the outbuilding. An email sent to the Gopleruds on August 19 followed a second complaint about the property. This complaint prompted Board member Mike Dennis to drive by the Goplerud property, where he observed a shed being constructed.

A meeting took place on August 20, attended by Clemenson and Board members Dennis, Tom Walton, and Mike Richmond. Richmond was an employee of Knapp Properties, an entity the Association hired for property management. Observations included issues with the outbuilding deck, installation of a second septic system, and landscaping and shed construction. Clemenson also admitted her parents used the outbuilding as a residence and indicated that use would continue permanently.[3]

Second and third letters, dated August 28 and September 1, were sent to the Gopleruds following the meeting. The letters addressed compliance with the covenants in reference to the Hales' permanent residence in the outbuilding; the size of the deck attached to the outbuilding; construction of a shed, concrete slab, and second septic system; and landscaping that had not been submitted to or

---

[2] There is some dispute about when the August 13 letter was actually sent. The envelope shows it was postmarked on August 21, 2015.

[3] At the time of the August 20 meeting, construction of the shed was incomplete. Clemenson testified she was told construction could be completed and never agreed to stop. Dennis testified he and Clemenson agreed to stop construction on the shed.

approved by the ACC.[4]  The letters prompted a second meeting, which took place on September 2.  The Gopleruds, Walton, Dennis, and Richmond were present. The landscaping issue was resolved when Clemenson indicated much more rock had mistakenly been installed than originally intended and was scheduled to be removed immediately.  The Gopleruds agreed to submit ACC applications for the modified rock landscaping, shed, second septic system, enlarged deck, and a second shed that would be built on the concrete slab.[5]  Applications for the deck and landscaping were approved, the application for the existing shed was denied.[6] In September 2015, it was discovered a large bridge was being built on the Goplerud property.  No ACC application had been submitted prior to construction, nor had one been submitted at the time of trial.

Following the October Board meeting, another letter was sent to the Gopleruds that explained the ACC application denials, addressed the new bridge construction, requested an application for the concrete slab, and again asked for written confirmation of compliance with the covenants regarding the use of the outbuilding.  This letter requested compliance to "avoid any further proceedings."

---

[4] The letters also addressed a berm added to the property.  It was later discovered the berm is on a neighboring lot.  The letter also asked the Gopleruds to comply with the covenant regarding use of the outbuilding and provide written confirmation that compliance would be effectuated within forty-five days, including removing the Hales from permanent residence in the outbuilding.

[5] The second septic system was added to the property to provide service to the outbuilding.  Its placement was dictated by Dallas County.  The ACC application for the second septic system was submitted after installation and was denied because of its placement and visibility.  The second septic system was initially a part of this action before the district court but was dismissed when the ACC discovered the Gopleruds complied with the request to shield the visible access points with landscaping.

[6] No application for the shed to be built on the concrete slab in the future was submitted.

The Gopleruds did not reply, and this lawsuit was filed following a special Board meeting held on October 27.

Trial was held over eight days in September 2016 and May and June 2017. The trial transcript and record show the district court was presented with thousands of pages of exhibits from the parties. Presentation of the Gopleruds' case-in-chief took five and one-half days, and the Association's took one and one-half days. The district court order was entered April 27, 2018, granting the Association the requested injunctive relief, ordering removal of unapproved structures, and concluding the Association was entitled to recover reasonable attorney fees and costs incurred in the litigation. The Goplerud's appealed. Hearing on the attorney-fee issue was held in August. The district court awarded costs totaling $4140.05 and attorney fees in the amount of $129,340.00 to the Association.[7] The Gopleruds again appealed. The supreme court granted the Gopleruds' motion to consolidate the appeals and transferred the matter to this court for resolution.

## II.     Standard of Review

When a case is tried in equity, our review is de novo. Iowa R. App. P. 6.907. The petition in this matter was filed in equity and the matter will accordingly be reviewed de novo. *Id.* In conducting a de novo review, we give weight to factual determinations of the district court but are not bound by them. Iowa R. App. P. 6.904(3)(g). When parties provide conflicting testimony, we give "great weight" to the trial court because they are "in a far better position to weigh the credibility of

---

[7] The total award, $133,480.05, will accrue interest of 4.39% per annum from the date of judgment.

witnesses than the appellate court." *Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016) (citation omitted).

## III. Analysis

### A. Covenant Enforceability

First, the Gopleruds argue the district court erred in not finding the Association lacked authority to enforce the covenants because it did not follow its own bylaws by failing to validly elect board members and ignoring provisions concerning term limits for ACC members. The Association argues the Gopleruds failed to preserve error on these claims. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (noting "issues must ordinarily be both raised and decided by the district court before we will decide them on appeal" and directing, "[w]hen a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal"). The claims were raised before the district court. In its written ruling, the district court stated in a footnote it "[made] no determination regarding [Gopleruds'] allegation of invalidity of the board" and later found ratification of both the Board and ACC rendered the "invalidity defense moot as it relates to the ACC's actions."

During the pendency of trial proceedings the Association and Board ratified the prior actions of the Board and ACC after the civil suit was filed. On appeal, the Gopleruds contend the Association, Board, and ACC "should not be allowed to retroactively ratify their various actions in order to defeat [the Gopleruds'] right to their invalidity defenses." "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent without actual authority." Restatement (Third) of Agency § 4.01(1) (Am. Law Inst. 2006); *see Life*

*Inv'rs Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 647 (Iowa 2013) (adopting third restatement of agency as to ratification). As the Gopleruds point out, ratification may not be employed "to diminish the rights or other interests of persons, *not parties to the transaction*, that were acquired in the subject matter prior to the ratification." Restatement (Third) of Agency § 4.02(2)(c) (emphasis added). Specifically, "[r]atification does not operate to destroy rights [of a third party] created between the time of the agent's act and the principal's affirmance except" in circumstances not relevant here. *Id.* § 4.02, cmt. e. The problem with the Gopleruds' position is that they are not "persons, not parties to the transaction." *Id.* § 4.02(2)(c). Here, the principals are the members of the Association, which includes the Gopleruds. Because the Gopleruds were a party to the ratification transaction, they cannot seek shelter under the exception for third-party rights. *See id.* Assuming the retroactive-ratification shield applies only to third parties foreign to the original transaction, we agree with the district court that ratification renders moot the issue of Association's ability to enforce the covenants.

B.    Reasonability of Enforcement

The Gopleruds argue the Board and ACC requirement for pre-approval of projects must be reasonable and not arbitrary or capricious. Specifically, the Gopleruds argue the Board and ACC were unreasonable in their enforcement of the covenants regarding the shed, concrete slab, and bridge. The Gopleruds ask this court to adopt a reasonableness standard, under which we must examine how a governing organization has dealt with other property owners in the given

community.[8]  In general, the requested reasonableness standard requires a fact-intensive inquiry into the particular circumstances of a given situation.  *E.g.*, *Dodge v. Carauna*, 377 N.W.2d 208, 210 (Wis. Ct. App. 1985).

The Association argues courts should give deference to the decisions of boards or associations governing residential communities.[9]  The Association does not argue a board or association may act unreasonably but cites to cases from other jurisdictions indicating the governing authority is in the best position to make determinations on the esthetics of the community and their decisions should be given deference.  *E.g.*, *Normandy Square Assoc., Inc. v. Ellis*, 327 N.W.2d 101, 104 (Neb. 1982).

In effect, the Gopleruds are asking courts to substitute their own judgments for those of boards or associations governing residential communities.  Extensive testimony was given by Board and ACC members on the purposes for denying each structure, including, but not limited to, findings the property had a cluttered appearance and that the structures were not in accordance with the aesthetics of the community.  Furthermore, the Gopleruds admitted they were aware of and agreed to the covenants at the time the home was purchased in Napa Valley and at each time an application for property modification was made to the ACC.[10]  The covenants clearly state "the ACC's decisions shall be deemed the best interpretation of the intent and interpretation of these provisions."  Our de novo

---

[8] The Gopleruds cite to no Iowa authority dictating the adoption of a reasonableness standard, nor could this court find one.

[9] The Association cites to no Iowa authority dictating the adoption of a deferential standard, nor could this court find one.

[10] When submitting an application to the ACC via the Napa Valley website, the applicant must check a box signifying the applicant has read the covenants.

review of the record and detailed findings of the district court reveal the Board and ACC decisions regarding the shed, concrete slab, and bridge were not unreasonable, arbitrary, or capricious in finding the structures were in violation of the covenants.

> ### C. Injunctive Relief

The Gopleruds argue the district court did not use the appropriate injunctive-relief standard. They argue injunctive relief is an inappropriate remedy because it is inequitable, insisting the court should balance harms in consideration of both the Gopleruds and the Hales.[11] The Association argues the correct standard was applied and satisfied, the agreed-upon covenants state the Association may seek injunctive relief without proving damages, and the requested harm-balancing is not required.[12]

The Gopleruds rely on *Hockenberg Equipment Company v. Hockenberg's Equipment & Supply Company of Des Moines, Inc.*, to argue courts should engage in harm balancing even when the parties have stipulated to injunctive relief. 510 N.W.2d 153, 157–58 (Iowa 1993). In *Hockenberg*, two restaurant supply businesses, one in Omaha, Nebraska, and the other in Des Moines, resulted from

---

[11] On appeal, the Gopleruds argue the covenants are an adhesion contract that does not contain language saying the Association need not prove irreparable harm. Although the Gopleruds raised similar arguments on an alleged lack of injury to the Association, none were based on an adhesion-contract theory. In order to preserve error, an issue must be raised and ruled on by the district court. *Meier*, 641 N.W.2d at 537. Thus, error has not been preserved on that argument.

[12] The Gopleruds rely on *Kruse v. Claar*, No. 02-1233, 2004 WL 61053, at *5–6 (Iowa Ct. App. Jan. 14, 2004), in which this court found failure to submit plans to the appropriate committee, as required by restrictive covenants, did not justify injunctive relief requiring removal of the offending structures. However, *Kruse* appears to be factually distinguishable from the case at bar. There is no indication of a contractual right to pursue injunctive relief in *Kruse*, as there is here. *See id.* at *1–2. Accordingly, we find *Kruse* unpersuasive.

commercial transformations, bearing nearly identical names. *Id.* at 155. The parties agreed the Omaha business would stop using the name "Hockenberg" when doing business in central Iowa among other remedial conduct but repeatedly violated the stipulated agreement. *Id.* The Omaha business refused to agree they would stop breaching the stipulated agreement in the future and admitted to past breaching conduct. *Id.* at 158. The Des Moines business was able to demonstrate irreparable harm would result from continued breach of the stipulated agreement, there was no appropriate remedy at law, and continued litigation would follow from future conduct breaching the stipulated agreement. *Id.* The extensive harm suffered by the defendant resulted in the injunctive relief awarded to the defendant.

The case at bar is factually distinguishable. The covenants contain a provision expressly claiming the right to seek injunctive relief without proving damages:

> In the event of a violation, or threatened violation, of any of the covenants, conditions and restrictions herein enumerated, the Association, . . . shall have the right to enforce the covenants, conditions and restrictions contained herein, and pursue any and all remedies, at law or in equity, available under applicable Iowa law, *with or without proving any actual damages*, including the right to secure injunctive relief or secure removal by due process of any structure not in compliance with the covenants, conditions and restrictions contained herein . . . .

(Emphasis added.) There is nothing in *Hockenberg* leading this court to believe a similar clause was included in the stipulated agreement. *Id.* at 155 (noting only that breach would leave the Des Moines business "with no adequate remedy at law"). The language of the covenants, to which the Gopleruds admitted to understanding and agreeing to, explicitly states the Association need not prove

actual damages. Accordingly, by the express terms of the contract, the Association need not prove any harm.

The Gopleruds correctly state injunctive relief is an extreme remedy, granted only when necessary to prevent irreparable harm. *Presto-X-Co. v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989). However, even if we do engage in the requested harm balancing, the injunction is still warranted. In *Presto-X-Company v. Ewing*, our supreme court found an injunction was properly granted when a former employee of a pest extermination company breached a covenant not to compete contained in his employment contract. *Id.* The court found Presto-X had a contractual right preventing the former employee from competition that could be remedied only by imposition of the injunction. *Id.*

Here, the Association has a right to enforcement of the covenants which were breached by the Hales' residence in the outbuilding and construction of the shed, concrete slab, and bridge without ACC approval. If injunctive relief is granted, the Gopleruds will be harmed in paying for removal of the shed, concrete slab, and bridge, and returning their lot to its condition before the structures were built.[13] Any harm stemming from barring the Hales' permanent residence in the outbuilding will be suffered by the Hales, not the Gopleruds.[14] The Association will

---

[13] Estimates obtained in July 2018 by the Association for the purposes of responding to the Gopleruds' motion for immediate stay estimate the monetary harm to the Gopleruds at $15,220.00.

[14] Trial testimony indicated the Hales used the proceeds of the sale of their acreage to pay for construction of the outbuilding and have no other financial resources to build another residence or relocate off the Goplerud property. There is nothing in those harms related to the Gopleruds. The record does indicate control of the outbuilding will transfer to the Gopleruds when the Hales pass away. The Gopleruds have already indicated it will likely serve as a "war room" space for trial preparation as a part of Goplerud's legal practice and as a guest house. No arrangement for the Gopleruds to purchase the outbuilding from

suffer harm in multiple ways. If a permanent second residence is allowed on the Gopelruds' lot, the Association will face increased residential density, including use of the common areas of the community, without the benefit of community assessments.[15] Furthermore, the Napa Valley community relies on residents to comply with the covenants to maintain the character of the community. If the structures on the Goplerud property that were built without pre-approval are allowed to remain despite the eventual ACC denial, it will be detrimental to the community. Failing to enforce the covenants against the Gopleruds tells other residents to follow their procedure in initiating construction prior to seeking permission from the ACC, and ultimately complete any construction because even the process of litigation will not result in enforcement. This enforcement failure may lead to continued, rampant violations and frustrate "fine single family residential community with high quality homes" purposes for which the community was established.

Accordingly, on our de novo review, we find the proper standard was applied and an injunction is the appropriate remedy for the covenant violations.

D.    Attorney Fees

An attorney-fee award is reviewed for an abuse of discretion. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 470 (Iowa 2010). This is our most deferential standard of review. *State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).

---

the Hales is, or has ever been, established. Accordingly, there is no loss to the Gopleruds in barring the Hales from residing in the outbuilding.

[15] Maintenance costs for the community, including roads and common areas, are assessed by lot. Accordingly, building more than one permanent residence on one lot will increase use of common areas but increase assessments paid only by lot owners.

An award will be reversed only when the grounds for the award "are clearly unreasonable or untenable." *NevadaCare*, 783 N.W.2d at 470.

The Gopleruds argue the district court abused its discretion in awarding attorney fees to the Association because the Association was not successful in its claim regarding the second septic system, it failed to comply with corporate formalities, fees for the last day of trial were inappropriate, and equitable considerations demand a reduction of the award.[16]

"When a written contract allows for the recovery of attorney's fees, the award must be for reasonable attorney's fees." *Ales v. Anderson, Gableman, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 842 (Iowa 2007) (citation omitted). The party seeking an attorney-fee award must prove "the services were reasonably necessary and that the charges were reasonable in amount." *Id.* (quoting *Lynch v. City of Des Moines*, 464 N.W.2d 236, 238 (Iowa 1990)). Reasonable attorney fees are "calculated by multiplying the number of hours reasonably expended on the winning claims times a reasonable hourly rate." *Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009) (quoting *Dutcher v. Randall Foods*, 454 N.W.2d 889, 896 (Iowa 1996)). When awarding attorney fees, courts consider factors including "[t]he time necessarily spent, the nature and extent of the service, the amount involved, the difficulty of handling and importance of the issues, the responsibility assumed and results obtained, the standing and experience of the attorney in the profession, and the customary charges for similar service." *Id.* at 832–33 (quoting

---

[16] The Gopleruds also argue attorney fees should not be awarded because the district court should not have entered judgment for the Association. Because we find on our de novo review the Association should prevail, we reject this claim.

*Schaffer v. Frank Moyer Constr., Inc.*, 628 N.W.2d 11, 24 (Iowa 2001)). Reductions in a reasonable fee may be made based on consideration of the totality of the facts and circumstances of litigation. *Id.*

The district court awarded the Association $129,340.00 in attorney fees and $4140.05 in costs. The fees were awarded for 446 hours of work at a rate of $290.00 per hour. The district court found the total number of hours was reasonable based on the number and complexity of the issues, which resulted in thousands of pages of exhibits presented during the eight-day trial. The district court noted some of the arguments were directed at the legitimacy of the Association and enforceability of covenants, which "could have wide-ranging effects" and validated the 446 hours worked. The septic system fees were found reasonable based on legitimate preparation for litigation and withdrawal time was necessitated because of the Gopleruds' own conduct in failing to notify the ACC the landscaping had been installed. Furthermore, the district court recognized the Association sought to reduce fees incurred as no fees were billed for legal research, billable hours during trial were capped at eight hours per day, and hours spent on post-trial briefing were waived. The district court found the $290.00 per hour rate was reasonable for similar reasons. Both parties submitted affidavits indicating a reasonable rate for similar services from firms in the same area, including an affidavit from another attorney in Goplerud's firm.

The district court also found the $4140.05 was a reasonable amount of costs and expenses based on the issues presented. The court noted that all costs were supported by invoices submitted to the court, and electronic legal research and copying expenses were waived.

Litigation of this case began with a petition filed in October 2015, the eight-day trial began in September 2016 and was completed in June 2017, and the hearing for attorney fees was in August 2018. The issues presented were complex and discovery requests resulted in thousands of pages of documents and photos. Based on the detailed findings of the district court, we find there was no abuse of discretion in the attorney-fee and costs award.

**IV.    Conclusion**

On our de novo review of the record, we affirm the district court order enjoining the Hales from using the outbuilding as a residential dwelling; ordering removal of a shed, bridge, and concrete slab; and requiring restoration of the lot to its pre-construction condition. We also find there was no abuse of discretion in awarding attorney fees and costs to the Association. We affirm the district court.

**AFFIRMED.**