# IN THE COURT OF APPEALS OF IOWA

No. 18-2073
Filed January 21, 2021


**BRIAN HEATH DAVIS,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____


Appeal from the Iowa District Court for Fremont County, James S. Heckerman, Judge.


Applicant appeals the district court's denial of his petition for postconviction relief. **AFFIRMED**.


R. Ben Stone of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee State.


Heard by Mullins, P.J., and May and Schumacher, JJ.

**SCHUMACHER, Judge.**

I.   **Background Facts**.

Brian Davis was convicted of the murder of his fiancé, Holly Durben, on February 16, 2015, over five years after her body was recovered in an upstairs bedroom of the home Durben shared with Davis. Davis informed law enforcement that Durben had committed suicide. We previously detailed the facts of this case in Davis's direct appeal in which we affirmed Davis's conviction. *See State v. Davis*, No. 15-0666, 2017 WL 108278, at *1−3 (Iowa Ct. App. Jan. 11, 2017). Facts relevant to the postconviction relief (PCR) proceeding follow.

II.  **Proceedings**.

On November 7, 2014, Davis was charged by trial information with the first-degree murder of Durben. Davis demanded a speedy trial and waived his right to a jury trial. A bench trial commenced on February 3, 2015. The court returned a guilty verdict on February 16. An amended verdict was filed on March 4. Judgment was entered on April 9. Davis was sentenced to life imprisonment. Davis appealed his conviction, and we affirmed. *Davis*, 2017 WL 108278, at *1.

On August 3, 2017, Davis filed a PCR application, claiming his counsel was ineffective in several respects. In preparation for the PCR trial, Davis conducted depositions of his three criminal defense lawyers[1]; retained and deposed crime scene processing expert Kenneth Moses; deposed Corey Wasenius, an

---

[1] One of Davis's defense counsel assisted in the case pro bono and has experience working as both a prosecutor and a defense attorney. Another defense counsel worked as a public defender for ten years and has been involved in approximately twenty-five class "A" felony trials, both as a prosecutor and defense attorney. The third defense counsel has been a public defender since 2010 and specializes in class "A" felonies.

investigator with the Iowa Public Defender's Office; and submitted a letter from a mental-health therapist, Cynthia Freemyer, describing the risk for lethality in a client expressing suicidal ideation. Additional evidence not in the record at the criminal trial was introduced in the PCR proceedings, including the medical examiner's autopsy report, transcripts of the pre-trial depositions of witnesses Jamie Stockwell and Michael Halverson, and a 2009 call log from the medical examiner's office.

On October 5, 2018, the district court held an evidentiary hearing. At the conclusion of the PCR hearing, the district court requested proposed orders from the parties. The district court adopted the State's order in its ruling.[2] The district court denied Davis's PCR application. On October 17, Davis's counsel filed a motion to enlarge and reconsider. On October 23, Davis filed a pro se motion to enlarge and reconsider. On November 26, the motions were overruled, and on November 27, Davis filed a notice of appeal. Davis is represented by counsel on this appeal and also submitted a pro se brief.[3]

---

[2] We note Davis's objection to the district court's adoption of the State's proposed order. Davis asks this court to apply a less deferential standard of review in his case. We have previously declined to adopt an alternative standard of review in similar circumstances. *See Richter v. State*, No. 15-1800, 2017 WL 935064, (Iowa Ct. App. March 8, 2017). However, we recognize the necessity to review the record conscious of the fact that the State prepared the order and will "scrutinize the record more carefully when conducting our appellate review." *See NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). At oral argument, the State invited careful scrutiny of the record.

[3] The State argues that we should disregard Davis's pro se filings. Recent legislation, S.F. 589, effective July 1, 2019, prohibits applicants from filing pro se briefs if they are already represented by counsel. Iowa Code § 822.3B(1) (2019) ("An applicant seeking relief under section 822.2 who is currently represented by counsel shall not file any pro se document, including a brief, reply brief, or motion, in any Iowa court. The court shall not consider, and opposing counsel shall not respond to, such pro se filings."). Davis filed his notice of appeal on November 27,

**III.    Discussion—Arguments Prepared by Counsel**.

Through counsel's brief,[4] Davis points to several instances where he believes counsel's performance was deficient.  At oral argument, Davis argued the heart of his PCR appeal are issues of credibility and complacency—specifically the failure of counsel to attack the credibility of witnesses, urging that because the physical evidence is inconclusive credibility is key.    Davis further argues complacency on behalf of his counsel rose to the level of recklessness.  Davis's arguments center around four broad issues: (1) the medical examiner's testimony and her reliance on certain information; (2) the testimony of witness Stockwell and her impeachment; (3) the use of particular statements made by Davis and trial counsel's exclusion efforts as well as appellate counsel's advocacy on this issue; and (4) crime scene processing and lack of expert witnesses.

---

2018.  In *State v. Macke*, the Iowa Supreme Court held amendments to S.F. 589 dealing with guilty pleas and ineffective assistance of counsel did not apply retroactively to appeals pending on July 1, 2019.  933 N.W.2d 226, 228 (Iowa 2019).  *Macke* upheld long-standing precedent that "unless the legislature clearly indicates otherwise, statutes controlling appeals are those that were in effect at the time the judgment or order appealed from was rendered."  *Id*. at 231 (quotations omitted).  The State argues *Macke* is not controlling because the amendments at issue in *Macke* affect a defendant's right to appeal or limit the types of claims he may bring, whereas section 822.3B "only changes the procedure for how he may present his claims . . . ."  This court recently rejected the same argument with respect to pro se filings of a defendant on direct appeal.  *See State v. Krone*, No. 18-0130, 2020 WL 821935, at *3-4 (Iowa Ct. App. Feb. 19, 2020).  Similarly, we find no suggestion in *Macke* that the supreme court would treat amendments in S.F. 589 not at issue in *Macke* differently.  We conclude we may consider Davis's pro se filings.

[4] There is significant overlap between the briefs submitted by counsel and Davis's pro se brief.  We first address the issues raised by counsel and follow with the issues remaining in Davis's pro se brief.  Where the issues raised in both briefs are sufficiently related, we address them as part of the arguments prepared by counsel.

### A.     Standard of Review

A PCR applicant may raise the issue of ineffective assistance of counsel without preserving the issue on direct appeal.  Iowa Code § 814.7(1) (2017).  Appellate review of PCR proceedings is typically for correction of errors at law.  *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).  However, applications that allege ineffective assistance of counsel implicate an applicant's constitutional rights and therefore require de novo review.  *Id.*; *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019).  To establish an ineffective-assistance-of-counsel claim requires the applicant to show by a preponderance of the evidence that: "(1) trial counsel failed to perform an essential duty, and (2) [the] failure resulted in prejudice."  *Sauser v. State*, 929 N.W.2d 816, 818 (Iowa 2019) (citation omitted); *accord Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Failure to prove either prong is fatal to an ineffective-assistance-of-counsel claim.  *State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015).

Under the first prong, "we begin with the presumption that the attorney performed competently."  *Ledezma*, 626 N.W.2d at 142.  We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *State v. Haas*, 930 N.W.2d 699, 703 (Iowa 2019) (citation omitted).  An applicant must rebut the presumption by proving trial counsel "perform[ed] below the standard demanded of a reasonably competent attorney."  *Id.* (citation omitted).  "This is more than a showing that a trial strategy backfired or that another attorney would try the case differently."  *Lorenzo Baltazar*, 935 N.W.2d at 869.  "We will not find counsel incompetent for failing to pursue a meritless issue."  *State v. Brubaker*, 805 N.W.2d 165, 171 (Iowa 2011).  Under the

second prong, to establish prejudice, "a[n] [applicant] must show a reasonable probability that the result of the trial would have been different." *State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## B.      Medical Examiner's Testimony

On direct appeal, Davis claimed his trial counsel was ineffective in their performance regarding the testimony of Associate State Medical Examiner, Dr. Jerri McLemore. We found the record insufficient on Davis's direct appeal to resolve the claim and left the issue open for PCR proceedings.[5] *Davis*, 2017 WL 108278, at *11. On appeal from denial of his PCR application, Davis takes issue with counsel's performance related to Dr. McLemore in three respects: (1) Dr. McLemore's reliance on certain contested information, (2) portions of her testimony, and (3) the decision not to hire an expert witness.

### 1.      Medical Examiner's Reliance on Contested Information

First, Davis argues that Dr. McLemore improperly relied on two pieces of information: (a) evidence existed showing that Davis had "high-velocity blood splatter" on his clothing and (b) Durben had no history of suicidal ideation. Davis contends that his trial counsel was ineffective for not correcting this information prior to trial, not competently cross-examining Dr. McLemore, and not informing the fact-finder of the contested information.

---

[5] Our 2017 decision on Davis's direct appeal noted that Dr. McLemore's deposition was not part of the record. Dr. McLemore's deposition from the criminal trial was also not included in the PCR record.

*a.    2009 Autopsy Report*

In July 2009, Dr. McLemore conducted an autopsy of Durben and filed a report of her findings on December 17.  The report found both the cause and manner of death to be undetermined.  In the opinion section of the autopsy report outlining the basis for her conclusion, Dr. McLemore stated, "There were, however, subtle discrepancies regarding a possible high-velocity blood spatter on the significant other's clothing."  Additionally, the report states, "Further investigation revealed that the decedent had no history of suicidal ideation or suicidal attempts."  The report concludes, "Aspects of the scene investigation, autopsy findings, and decedent's history, namely, lack of any suicidal ideation raise the possibility of homicide.  Incapacitation of the decedent from choking cannot be excluded.  Based on the circumstance as they are currently known, the manner of death is undetermined."

*b.    2015 Trial Testimony*

At trial in 2015, Dr. McLemore's 2009 autopsy report was not submitted into evidence.  Dr. McLemore testified that the basis of her undetermined conclusion was:

> Because of the location of the shotgun wound, which is highly unusual for a self-inflicted shotgun wound, because of the partial bruising of the neck, which I had no good answer as to why they were there, I could not say one way or the other whether Ms. Durben actually did die of a shotgun wound to the head.
> I could not say whether or not she might have been incapacitated beforehand.  And so because of that, I could not determine the cause or manner of death.  They were both deemed undetermined.

*c.* *Contested Information—"High-Velocity Blood Spatter"*

On the morning of Durben's death, Davis's clothing was seized prior to the issuance of a search warrant while Davis was in the hospital.[6] Davis's shirt and shorts were sent to the Iowa Division of Criminal Investigation (DCI) Crime Lab for analysis. Criminalist Michael Halverson was responsible for testing Davis's clothing. On January 8, 2015, in preparation for Davis's criminal trial, Halverson was deposed by Davis's defense counsel.[7] Halverson was asked whether he conducted high-velocity blood splatter testing on Davis's clothing. Halverson explained that no testing was done because the splatter on the shorts was too small to conduct high-velocity blood spatter testing.

Despite the inability to conduct high-velocity blood spatter testing, Dr. McLemore's autopsy report referenced "possible high-velocity blood spatter on the significant other's clothing." Dr. McLemore testified that when making a report, she considers the circumstances of death. In Durben's case, she received a preliminary report from the county medical examiner and the DCI file related to the case. It appears that sometime during the initial stages of the investigation, the possibility of high-velocity blood splatter testing was considered by investigators. This information was given to Dr. McLemore, and she included it in her autopsy report.

---

[6] On the morning of the trial in 2015, the clothing was suppressed, as the seizure was found to be in violation of the Fourth Amendment by the trial court.

[7] The deposition revealed that Halverson examined Davis's shorts and identified twelve small stains, ten of which were identified as blood. DNA testing was conducted on the stains, nine matched Davis, and one returned a mixed result with the dominant source matching Durben.

Davis argues his trial counsel was required to correct the autopsy report prior to trial. However, the report was not admitted into evidence at the criminal trial, and Dr. McLemore did not testify regarding the contested information. She made no mention of "possible high-velocity blood spatter on the significant other's clothing" during the course of her testimony. Removing the information prior to trial would have little, if any, effect on the evidence actually presented at trial. We find a lack of prejudice concerning this claim.

### d. Contested Information—"Suicidal Ideation"

The 2009 autopsy report indicates Durben lacked suicidal ideation. Dr. McLemore testified that lack of suicidal ideation formed a basis for her conclusion. Conflicting testimony and evidence of Durben's suicidal ideation leading up to the morning of her death was presented at trial. Dr. McLemore was told by investigators that Durben lacked suicidal ideation.[8] Davis asserts his defense counsel's treatment of Dr. McLemore's reliance on this information was constitutionally deficient. We disagree.

In his deposition, one of the defense counsel was questioned about defense strategy with regard to the medical examiner's reliance on the contested information. He explained it was something he sought to point out for the court "from the get-go" and that their strategy was to show "[Dr. McLemore] was skewed and that she had been given this information prior to doing the autopsy." In the

---

[8] As a part of his application for postconviction relief, Davis submitted into the record for the first time a 2009 call log from the medical examiner's office. The log indicates that on October 27, 2009, a member of the Area Prosecutions Division of the Attorney General's Office called the medical examiner, and Dr. McLemore noted, "Holly—No known history of suicidal ideation—very against suicide."

opening statement, defense counsel made clear the potential weaknesses in Dr. McLemore's autopsy report. He argued,

> But if you listen to Dr. McLemore's testimony . . . listen to what forensic—what her forensic autopsy takes into account. This is not just a review of the body. This is her taking into account the circumstances that are told to her by law enforcement. . . .
> . . . .
> . . . She was told by law enforcement on further investigation that there was not—no suicidal ideations regarding Holly. . . . [Y]ou are going to hear three separate witnesses talk about the fact that Holly Durben had threatened suicide.

On cross-examination, a member of the defense team elicited testimony from Dr. McLemore that established she had received information that Durben lacked suicidal ideation. He specifically pointed out the portion of the autopsy report that states a lack of suicidal ideation raised the possibility of homicide. Counsel went on to question Dr. McLemore about how this information influenced her conclusion:

> Q. If there was suicidal ideation either that day or over a period of time of up to [five] months before, would that have affected your opinion? A. Probably not.
> . . . .
> Q. Again, I'm reading your report, and it says the thing that bothered you was mainly lack of any suicidal ideation raised the possibility of homicide. So removing that possibility— A. Yes.
> Q .—doesn't that affect you at least somewhat? A. Because I still have aspects of, especially my autopsy findings in that sentence. It's not just one piece of evidence that is concerning me—
> Q. Okay. A.—or has concerned me. Anyway, I couldn't form an opinion. That's why it's undetermined.

Counsel's questioning adequately confronted Dr. McLemore about her reliance on a lack of suicidal ideation. Trial counsel's subsequent line of questioning tested the report's conclusion under an alternative where there was suicidal ideation. The questioning by counsel of Dr. McLemore concerning her

conclusion raised the issue and alerted the trial court to the issue. We find no breach of duty.

### 2. "Highly Unusual Wound"

On direct appeal, Davis specifically argued that his counsel was ineffective for not lodging a foundational objection to Dr. McLemore's statement that the shotgun wound was in a "highly unusual place." *Davis*, 2017 WL 108278, at *11. We stated that it was unclear whether Dr. McLemore "could have provided the requisite foundation for her statement." *Id.* Additionally, we noted the possibility of prejudice because the State identified Dr. McLemore's testimony as "the strongest evidence of Davis's guilt," and "the district court relied upon her expert testimony in its verdict." *Id.* at *11 n.12. Finally, we acknowledged the State's argument that "defense counsel may have had reasonable strategic grounds for failing to object to Dr. McLemore's testimony." *Id.* at *11. On this appeal, Davis contends his counsel was ineffective in cross-examining the witness on her "highly unusual" location claim and failing to seek a continuance in order to hire an expert witness to contest it. We reject this argument.

First, defense counsel made a reasonable and strategic objection to the contested testimony. When confronted with the unexpected testimony, defense counsel objected, arguing the testimony was "beyond the scope of the trial information and beyond the scope of the deposition." Counsel engaged in voir dire of the witness where counsel established that Dr. McLemore's opinions were given to a reasonable degree of medical certainty and that when asked in her deposition, she was able to give no opinion as to the cause and manner of death. Defense counsel argued that any opinions offered beyond that would not be to a reasonable

degree of medical certainty. The trial judge overruled the objection. The trial court's ruling on the objection was challenged on direct appeal, and we affirmed. *Id.* at *7.

Defense counsel, as well as the State at trial, acknowledged that a foundational objection also could have been made. However, in his deposition, defense counsel explained his strategy in avoiding a foundation objection and in not pursuing a line of questioning related to the witness's expertise and knowledge. In the view of counsel, Dr. McLemore's testimony left clear reasonable doubt and the testimony as favorable to the defense. Defense counsel did not want to "bolster" the witness for the State. He explained, "True expert witnesses will bolster their testimony whether they have any real basis to bolster it or not. . . . It's not our job to bolster that. And so I felt any foundational questions about that would only assist the State . . . ." Defense counsel also noted the potential risk of lodging a foundational objection, "Well, you take a risk on that. Any time you're going to ask—if I ask to voir dire a witness, I'm going to say what's your experience in this area, and she then throws out that she's got [eighty-two] papers in it, I have helped the State." A member of the defense counsel team testified in his deposition taken in advance of the PCR trial that he did not anticipate that Dr. McLemore would be testifying that the location of the wound was "highly unusual." Thus, when presented with the unanticipated testimony, counsel made a strategic decision to object to the offered testimony being outside the scope of the trial information and her prior deposition. This effectively brought the issue to the attention of the court and presented the issue. Trial counsel's actions and strategy were reasonable given the circumstances. We find no breach of duty in this regard.

Second, Davis asserts that his defense counsel was required to seek a continuance when confronted with Dr. McLemore's testimony. Davis points to the fact that in his deposition, defense counsel was asked what he would have done differently had he known prior to trial that Dr. McLemore would testify as she did. Defense counsel responded that, "[W]e also mostly would have gone and hired our own expert to then refute that statement because we don't believe that doctor's statement would have been based on recent research." Additionally, Davis points to another of defense counsel's statements that "in hindsight," trial counsel may have been ineffective for not seeking a continuance to hire an expert to contest Dr. McLemore's testimony.

However, defense counsel's statements that Davis now points to are responses to a hypothetical question. What strategy might have been more successful upon reflection does not establish that trial counsel was ineffective. Counsel's performance is judged under the circumstances known to them at the time. "[T]o some extent counsel's trial performance must be judged by his primary theory of defense. Selection of the primary theory or theories of defense is a tactical matter." *Schrier v. State*, 347 N.W.2d 657, 663 (Iowa 1984).

Defense counsel believed the case against Davis was weak and strategically chose to give the State as little time to prepare for trial as possible, demanding speedy trial. Defense counsel stated in his deposition,

> [W]e felt that we were going to try to hold the State to their burden sooner than later because we didn't think that they could be prepared as well as they could if they were given more time.
> And I think a lot of that was shown in the scrambling that the State had at the last minute.

It was reasonable and consistent with trial strategy not to seek a continuance, thereby forcing the State to prove their case under the expedited timeframe. When confronted with Dr. McLemore's testimony, counsel fulfilled their duty by making a reasonable objection, strategically choosing not to pursue a foundation objection so as to not potentially bolster the witness or alternatively undermine a witness whose overall conclusion they found in line with a finding of not guilty. Given the circumstances and what was known to counsel at the time, this was a reasonable strategy within the range of competent representation.

Critically, Davis has not offered how the hiring of an expert would have changed the outcome. An expert was not presented at the PCR trial to counter Dr. McLemore's testimony concerning the location of the gunshot wound. The trial court was presented with evidence by way of Davis's statements that he was not in the room when Durben was shot. During one of his interviews, he informed law enforcement that when he discovered Durben's body, he jumped on the bed, moved the gun out of the way, and shook Durben. In another interview, he said he moved the gun slightly and shook her before calling law enforcement. When law enforcement discovered Durben, the gun was lying across her body, the finger from her non-dominant thumb in the trigger jam, supporting the State's theory that the suicide scene was staged. Davis told investigators that he had unloaded the gun early that morning and placed it under the bed on which Durben's body was discovered. The only identifiable fingerprint located on the weapon belonged to Davis. Davis has failed to prove that the hiring of an expert concerning the location of the gunshot wound would have changed the outcome of the trial. We find a lack of prejudice concerning this claim.

### 3. Necessity of Obtaining Additional Forensic Expert

Finally, Davis argues his counsel was required to hire an expert to review the medical information provided to Dr. McLemore without the contested information. We disagree. In his deposition, defense counsel noted, "We looked at hiring a blood-splatter person. We looked at talking about the psycholog[ical] aspects of suicide. We looked at the experts as to whether women commit suicide by shotgun." However, he went on to explain that once the decision to demand a speedy trial was made other strategies concerning expert witnesses changed. Defense counsel did not have a duty to hire an expert witness when Dr. McLemore's conclusion was not necessarily adverse to their position and doing so would conflict with their trial strategy. *See Schrier*, 347 N.W.2d at 663 (finding counsel did not breach an essential duty for not hiring an expert witness to counter State's medical expert witness where there "were more appealing theories of defense than a possible battle of expert witnesses"). Counsel considered these issues and made a strategic decision not to delay trial. "[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Additionally, Davis has not proven to a reasonable probability that such an expert existed and would have offered a favorable opinion. *See Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994) ("To prove prejudice from a trial attorney's failure to investigate potential witnesses, a petitioner must show that the uncalled witnesses

would have testified at trial and that their testimony would have probably changed the outcome of the trial."). In supporting this claim, Davis points to the fact that defense counsel was aware of research that conflicted with Dr. McLemore's testimony and submitted a letter from mental-health therapist Cynthia Freemyer. However, Freemyer's letter states nothing specific to Durben and is merely a description of the standard treatment for a client expressing suicidal ideation. Davis has not presented a witness who could have testified to conflicting research or shown that it would have changed the result of his trial. We find Davis has failed to prove prejudice on this claim.

### 4. Conclusion—Medical Examiner

In conclusion, we find that Davis has not proven his defense counsel's performance was constitutionally ineffective in regards to medical examiner Dr. McLemore. No prejudice at trial resulted from the 2009 autopsy report's reference to the possibility of high-velocity blood splatter. Counsel fulfilled their duty by effectively cross-examining Dr. McLemore about Durben's suicidal ideation, and the contested information was made clear to the court. When confronted with testimony describing the location of the shotgun wound as "highly unusual," defense counsel acted competently by making a reasonable objection and were not required to seek a continuance in counter-variance of their trial strategy. Even if a breach were to be found for failing to move for a continuance, Davis has failed to prove prejudice on this claim. Finally, counsel did not have an essential duty to hire an expert witness to review partially redacted medical reports, and Davis has not shown doing so would have resulted in a result favorable to him at trial.

## C.    Witness Stockwell

Davis claims his counsel's performance with regard to witness Jamie Stockwell was ineffective.  In the early hours of the morning of her death, Durben texted Stockwell asking if she could stay with her.  After receiving the message, Stockwell called Durben, but she did not pick up.  Around 4:00 a.m., Stockwell left voicemail messages on both Stockwell's cell phone and Davis's home phone line inquiring whether Durben was safe.  Stockwell kept calling and eventually spoke with Durben and Davis.  Stockwell testified at trial concerning her relationship with Durben and her conversation with Durben on the morning of her death.  Davis asserts his trial counsel was deficient: (1) in failing to object to her reference to a text message[9] and (2) in challenging her credibility on cross-examination.

### 1.    Text Message

In his pro se brief, Davis claims his counsel was ineffective for failing to object on hearsay grounds to a portion of Stockwell's testimony that referenced the text message she received from Durben on the morning of her death.  The States argues the statements were admissible under the excited-utterance and then-existing state-of-mind hearsay exceptions.  *See* Iowa Rs. Evid. 5.803(3)(2), (3).  Defense counsel made a hearsay objection in response to Stockwell's testimony concerning her telephone conversation with Davis and Durben.  The State responded by arguing the statements qualify for the then-existing state-of-

---

[9] This basis was asserted in Davis's pro se brief and not included in counsel's brief. Because both claims of ineffective assistance of counsel involve the same witness, we consider them together here.  Davis raised the issue in his application.  The district court considered the claim and denied his application.  The claimed error is preserved.

mind hearsay exception. The objection was overruled. Assuming trial counsel was able to exclude evidence of the text message successfully, Davis has not met the prejudice prong. The evidence of consequence was Stockwell's conversation with Durben on the morning of her death not the text message. We find no prejudice in this regard.

2.     Counsel's Challenge to Stockwell's Credibility

Stockwell made statements relevant to this case on three separate occasions. They are presented in chronological order and then discussed as a part of Davis's claim.

*a.     2014 Interview with Investigators*

On October 31, 2014, Stockwell was interviewed by Special Agent Chad Fiedler. As the interview was concluding, Agent Fiedler asked, "Are you scared of Brian?" Stockwell responded,

> Am I scared of him? I'm not scared of nobody. [laugh] I've, I've just reached that point. I don't care what you are—male or female. I'm not scared of nobody, and I'm not gonna back down. But I'm not gonna say I'm gonna win or anything, but I'll try. [laugh] [pause] Nope, I'm not scared of him, actually I had actually told him a few times if he got stupid I was gonna get stupid on him.

Davis's defense counsel had an audio recording of the interview as well as a report generated by investigators describing the interview prior to trial.

*b.     2015 Deposition*

On Jan 27, 2015, one week before trial, Stockwell was deposed. Davis was present during the deposition. In her deposition, Stockwell stated that Durben had spoken to her about committing suicide "multiple times." Stockwell stated that while on the phone with Durben on the morning of her death, Durben told her "that

if she didn't get out of there or didn't have anywhere to go, then she was going to end up committing suicide," and "that she wanted help; she wanted to get out of there, and she wanted me to come help her."

### c. Trial Testimony

At trial, Stockwell testified about the morning of Durben's death. She was cross-examined by defense counsel, and the following line of questioning occurred:

> Q. Holly made suicidal statements to you when Brian and her were having arguments, didn't she? A. She told me she wanted out of there and wanted me to help her get away. She was done. She couldn't handle the hurt and pain and suffering anymore.
> Q. And if she couldn't get away, she was going to kill herself? A. She told me that five months prior to this happening.

Defense counsel confronted Stockwell about the statements she made in her earlier deposition. Defense counsel clarified that Stockwell had previously stated Durben made suicidal statements multiple times, including the night of her death. Stockwell continued to respond by saying that "it had been five months before that she had made the last final suicidal statement." Defense counsel sought to confirm that Stockwell had made inconsistent statements a few days earlier in her deposition, and the following line of questioning occurred:

> Stockwell: Yep. I said this. I was scared. But it wasn't—
> Q. What were you scared of, ma'am? A. I didn't—I have two children. And I'm not going to live my life at risk because—I am doing what I am doing, which is right.
> Q. Ma'am, did you also say those very same statements to investigators in 2014? A. I said quite a bit of statements to investigators.

Defense counsel offered a transcript of Stockwell's deposition and read into the record portions of her deposition that were inconsistent with her testimony. On

redirect by the State, Stockwell was asked, "Why were you scared at your deposition?" Stockwell responded, "I'm still scared. I have every reason. I have two children, and I know what Davis is capable of."

Stockwell's deposition testimony that Durben made suicidal statements to Stockwell on the morning of her death was helpful for Davis's defense. Therefore, it was imperative for counsel to impeach Stockwell when her trial testimony differed so significantly from what she said in her deposition. Counsel fulfilled this duty by impeaching Stockwell with her inconsistent statement and reading portions of her deposition into the record. Davis acknowledges that counsel impeached the witness with her prior inconsistent statements concerning Durben's statements about suicide. However, Davis argues counsel was required to also use Stockwell's statements to investigators that she was not afraid of Davis to further impeach her. We disagree.

There are clear strategic advantages in using Stockwell's depositional statements rather than her statements made to investigators for impeachment purposes. "We generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001). The statements most relevant to Davis's defense were that Durben made suicidal statements on the morning of her death. Statements made in a deposition are under oath, allowing them to be considered as substantive evidence when brought in through impeachment. By using the sworn statements to impeach the witness, defense counsel enabled the judge to consider her favorable depositional testimony concerning Durben's suicidal statements as substantive evidence despite her in-court testimony. Use

of Stockwell's statements to investigators not under oath could have only been offered as extrinsic evidence to prove she made the inconsistent statement rather than to prove she was not afraid of Davis. *See* Iowa R. Evid. 5.613.

Stockwell's credibility had been attacked on cross-examination; additional impeachment with her statements to investigators would be derivative and would do little to undermine her in-court assertion she was scared during her deposition, which occurred after she made the statements to investigators. Further, this line of questioning risked opening the door to more testimony concerning Stockwell's fear of Davis. Specifically, this line of questioning may have opened the door to previously excluded prior bad acts that were within the knowledge of Stockwell— that Davis had previously shot a man and stabbed another and that he was abusive to a previous girlfriend and had threatened to kill her.

### 3. Conclusion—Witness Stockwell

We do not find Davis's counsel was ineffective in the treatment of witness Stockwell. Davis is unable to show prejudice regarding the lack of hearsay objection concerning the text given the cumulative evidence of Stockwell's testimony concerning her conversation with Durben the morning of her death. Counsel competently and strategically impeached Stockwell with her sworn prior inconsistent statements. Counsel did not have an essential duty to pursue further impeachment on statements less relevant to Davis's defense and which posed the risk of introducing adverse testimony.

### D. Court's Reliance on Davis's Statements

#### 1. Ineffective Appellate Counsel

Davis claims his appellate counsel was ineffective for failing to raise on appeal the trial court's reliance on allegedly suppressed statements. "We judge ineffective assistance of appellate counsel claims against the same two-pronged test utilized for ineffective assistance of trial counsel claims." *Ledezma*, 626 N.W.2d at 141 (citations omitted).

At his PCR trial, Davis argued, "There can be no reasonable strategy for failing to raise a winning issue on appeal." However, no other evidence concerning appellate counsel's strategy or decision was presented. An assertion that if the issue been raised on appeal, it would have been successful is not sufficient to establish ineffective assistance of appellate counsel. *See Cuevas v. State*, 415 N.W.2d 630, 631 (Iowa 1987) (reversing this court's finding of ineffective appellate counsel where on direct appeal from defendant's murder conviction appellate counsel failed to raise issue of jury instructions permitting consideration of lesser included offenses and argument of the issue in companion appeal led to reversal of accomplice's conviction).

Further, it is not clear that had Davis raised the issue on direct appeal it would have been successful. Many issues were raised in Davis's motion for a new trial and in arrest of judgment. Appellate counsel was required to choose the most prudent among them to argue on appeal. "[M]ost experienced appellate lawyers or judges will attest it is a tactical blunder, often devastating to an appellant, to assign every conceivable complaint. Highly competent appellate lawyers generally assign only the strongest points and rely on them for reversal." *Id.* at 633. In PCR proceedings, counsel is presumed competent, and it is Davis's burden to prove counsel's performance fell below what is constitutionally

mandated. *See Jones v. State*, 479 N.W.2d 265, 272 (Iowa 1991). Davis has not met his burden to prove that appellate counsel was ineffective.

### 2. Counsel's Lack of Challenge to Un-Redacted Interview

Additionally, Davis claims his trial counsel was ineffective for failing to redact certain portions of offered evidence related to an interview between Davis and investigators. On October 27, 2014, Davis was interviewed at his mother's home by Special Agent Fielder. During the last twelve minutes of the interview, Davis was told by Agent Fielder that his shorts from the morning of Durben's death had blood from Durden on them and that "this type of blood . . . is basically indicative of high velocity spatter. . . . And basically, the only way for her blood in that manner to get on your shorts is for you to be in the room when it happened." Davis was asked multiple times if he was in the room when the gun went off. Davis maintained that he was not. Towards the conclusion of the interview, Davis responded to a question of whether he may have blocked the memory out, and he responded that "I mean I . . . I don't . . . I don't believe I was in the room. Like I said before, I told you guys . . . ."

The trial court, in part, relied on this statement by Davis in its verdict. Davis argues that his statements were prompted by illegally seized evidence making them "fruits of the poisonous tree" and should have been excluded as a part of the suppression ruling on his clothing. At trial, much of the audio and visual evidence submitted was not published in court. It appears inadmissible evidence contained in the exhibits was not physically redacted before submission. Davis alleges that trial counsel's failure to redact the statements in the exhibits constituted ineffective assistance of counsel. We disagree.

At trial, the parties agreed, in an effort towards expediency, that redaction of the evidence was unnecessary, as the judge would not consider inadmissible evidence. In his PCR brief, Davis acknowledges, "It is commonplace for attorneys on both sides of a criminal matter to be collegial. An attorney cannot be faulted for working cooperatively with opposing counsel to make a favorable deal or even to keep the door open for future discussions." When the audio recording and transcript of the interview was submitted into evidence, defense counsel objected, asking the court not to consider "officers' statements, any prior bad acts, and so forth that we already laid out for the court." The court received the evidence "subject to [the] objection regarding any inappropriate hearsay or bad acts or prior acts not admissible or not proper impeachment."

Defense counsel made clear its objection to any inadmissible evidence contained in the exhibits. The court, as fact finder, reassured counsel it would only consider admissible evidence. While the trial record is unclear as to whether the specific statements at issue here were subject to the broader suppression ruling on Davis's clothing, we are confident that the court understood the boundaries of its ruling and considered the evidence accordingly.[10] It is reasonable for defense counsel to presume the court is competent to fulfill its duties in accordance with the law and only consider admissible evidence. We find, in this bench trial, counsel did not have an essential duty to physically redact certain portions of exhibits after seeking multiple assurances from the court concerning the scope of the admissibility of the evidence, particularly in the absence of a jury.

---

[10] The trial court's ruling on the motion to suppress was orally pronounced into the record on the morning of trial; a written ruling was not filed.

**E.    Counsel's Lack of Alternative Crime Scene Expert Witness**

Davis contends that investigators mishandled the scene of Durben's death. He points to several alleged processing errors, including failure to record core body temperature, the absence of scaled blood-splatter photos, and lack of gunshot residue testing. In preparation for his PCR proceedings, Davis retained and deposed his own crime-scene expert, Kenneth Moses. In his deposition, Moses explained how the alleged deficiencies of the crime-scene processing limited what could be derived from subsequent reconstruction efforts at the time of trial and concluded that he believed Durben might have accidentally shot herself. Davis argues that trial counsel's failure to investigate and secure a crime-scene expert who could generate a record of testimony regarding the alleged deficiencies constitutes a breach of an essential duty. We disagree.

Counsel has a duty to investigate. However, this duty is not limitless and "does not require that counsel pursue every path until it bears fruit or until all conceivable hope withers." *Schrier*, 347 N.W.2d at 662 (quotations omitted) (citation omitted). "The extent of the investigation required in each case turns on the peculiar facts and circumstances of that case." *Id.* Counsel believed that the circumstances of the trial and experience of the judge made hiring their own expert unnecessary. Defense counsel explained,

> Once the decision was made to do a bench trial, some of those things [hiring an expert] were not going to be done, especially in light of it being Timothy O'Grady. He was an experienced criminal attorney himself and had tried many cases over the years, both in bench and jury trials.

He explained the judge "had a wealth of knowledge in [crime-scene processing] and would understand that the police officers did many things wrong and would

take those into consideration." Another defense counsel explained they did not hire an independent expert because they "did not believe [the State] would be able to present [their case] as well as they could if they were given more time," and because the evidence left room for reasonable doubt, "we felt we could move forward with what we had."

In Davis's case, the initial crime-scene processing occurred almost five years before trial. Defense counsel's strategy was to demand a speedy bench trial. Based on the crime-scene evidence, the State was unable to rule out the possibility of suicide. Defense counsel effectively cross-examined the State's firearms expert Victor Murillo. On cross-examination of Dr. McLemore, defense counsel effectively pointed out the lack of gunshot residue and fingernail testing. Additionally, he elicited testimony explaining how the failure to record body temperature and room temperature made it difficult to determine the time of death.

Davis has not shown his counsel was ineffective for not hiring an independent expert witness. *See id.* at 661–63 (finding counsel not ineffective for failing to commission independent scientific testing or draw favorable inference from State's failure to conduct such tests). Counsel competently demonstrated the alleged deficiencies in processing and acted consistent with their trial strategy. Further, Davis has not proven that had an expert witness been called, it would have sufficiently altered the outcome of his trial.

## IV. Discussion—Pro Se Arguments.

We now turn to the arguments raised in Davis's pro se brief not previously addressed. Through his pro se brief, Davis contends that (1) prosecutorial misconduct resulted from investigators improperly supplying allegedly false

information to Dr. McLemore; (2) that Dr. McLemore's testimony violated *State v. Tylor*, 867 N.W.2d 136, 162 (Iowa 2015); (3) his trial counsel was ineffective for not seeking a suppression hearing in regards to his polygraph interview; and (4) inadmissible evidence of his prior bad acts was introduced at trial.

### A.      Prosecutorial Misconduct

Davis alleges trial counsel was ineffective for failing to assert a prosecutorial misconduct claim.  Davis claims his right to due process was violated when the prosecutor supplied Dr. McLemore with the contested information previously discussed. "In analyzing the defendant's ineffective-assistance-of-counsel claim, our first step is to assess whether the record demonstrates . . . a meritorious due process violation.  Thus, we must consider whether the prosecutor was guilty of misconduct . . . and whether the record shows [the defendant] was prejudiced, i.e., denied a fair trial." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).  As noted earlier, the autopsy report containing the contested information was not admitted as evidence in the criminal trial, and the medical examiner did not testify to blood-splatter evidence.  Defense counsel cross-examined the medical examiner about the lack of suicide information supplied. We find no breach or prejudice.  "[I]t is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial." *Id.* (quotations omitted).  In the absence of a meritorious claim, counsel cannot be ineffective for failing to raise it.  *Id.* at 870.

### B.      *State v. Tyler*

Next, Davis claims Dr. McLemore's testimony violates the ruling in *Tyler.* 876 N.W.2d at 162 (stating "when a medical examiner bases his or her opinion of cause or manner of death on . . . on information obtained through police

investigation, such opinions would ordinarily be inadmissible . . . because would not does not assist the trier of fact"). This argument is being made for the first time on appeal, and we find it unpreserved. We have already addressed his ineffective-assistance-of-counsel claim related to the medical examiner's reliance on contested information. Davis has not established sufficient reason for failing to raise the issue, and this argument does not change our conclusion that his counsel was effective. *Tyler* was decided in June 2015 and Davis's trial occurred in February 2015. Trial counsel cannot be faulted for failing to raise a holding which had not yet occurred. *See State v. Liddell*, 672 N.W.2d 805, 814 (2003). Any other alleged procedural defect in regard to the autopsy report was not properly preserved.

### C. Polygraph

Davis argues his trial counsel was ineffective for not seeking a suppression hearing on evidence related to his polygraph interview. Davis preserved this issue by raising it in his application and motion to enlarge or reconsider. The district court considered the claim and denied his application. Davis argues that statements obtained through his polygraph interview violated his *Miranda*[11] rights; therefore, defense counsel had an obligation to seek a suppression hearing prior to trial to exclude the evidence.

On July 22, 2009, Davis agreed to submit to a polygraph examination. Before the interview began, Davis was given a form that described his rights. He was asked a series of questions to confirm that he understood his rights. Davis

---

[11] *Miranda v. Arizona*, 384 U.S. 436 (1966).

read aloud the last paragraph of the form titled "Certification," which included the statement "I wish to continue without an attorney. I am here of my own free will. I can now leave this room by merely telling [the polygraph administer] that I wish to leave." Davis signed and dated the form. Davis understood his rights as demonstrated during the examination—during a particularly accusatorial line of questioning, Davis stated that he wanted a lawyer, and the interview stopped. The evidence indicates that the examiner apprised Davis of his *Miranda* and Sixth Amendment rights; Davis understood these rights and voluntarily continued with the interview. No obvious *Miranda* violation occurred; therefore, it was not an essential duty for counsel to seek a suppression hearing prior to trial to exclude the evidence.

Further, defense counsel competently objected to introduction of the evidence. At trial, the polygraph examiner, Steven Peterson was called as a witness, and the State sought to introduce a video recording of the interview. Defense counsel objected, arguing, "polygraphs cannot be introduced in court." The State responded that they were not admitting any polygraph results, just the video recording of the interview. Defense counsel's objection was overruled. Defense counsel requested voir dire of the witness and elicited testimony from Peterson that made clear to the court that prior to the interview, Davis had received a pamphlet that stated that the results of the polygraph were not admissible in court. Defense counsel argued the evidence should not be admitted because Davis had agreed to the interview believing it would not be used against him, affecting the voluntariness of his statements for the purposes of trial. The court overruled defense counsel's objection and admitted the evidence. We find that

counsel fulfilled his constitutional duty by objecting to introduction of the evidence and making a competent argument to the court.

### D. Prior Bad Acts

Lastly, Davis argues, "testimony regarding an arrest of a dismissed charge was improperly admitted as clear proof of a prior bad act at trial." This issue was raised on direct appeal as both an evidentiary challenge and alternatively, as a claim of ineffective assistance of counsel. Because we found the evidentiary issue preserved, we addressed it on direct appeal and found no abuse of discretion. *See Davis*, 2017 WL 108278, at *8 & n.11. Therefore, Davis cannot prove the necessary breach or prejudice to succeed in his ineffective assistance of counsel claim on this basis.

### V. Conclusion.

For the above reasons, we affirm the denial of postconviction relief.

**AFFIRMED**.