# IN THE COURT OF APPEALS OF IOWA

No. 21-0065
Filed January 27, 2022

**CITY OF MARION, IOWA,**
    Plaintiff-Appellee,

**vs.**

**CAPITAL COMMERCIAL DIVISION, LLC,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Chad A. Kepros, Judge.


Capital Commercial Division, LLC appeals from an adverse judgment following a bench trial on the parties' dueling breach-of-contract claims. **AFFIRMED.**


S.P. DeVolder of The DeVolder Law Firm, P.L.L.C., Norwalk, for appellant.

William J. Miller and Manuel A. Cornell of Dorsey & Whitney LLP, Des Moines, for appellee.


Heard by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

This appeal stems from a breach-of-contract dispute between the City of Marion and real estate developer Capital Commercial Division, LLC over the terms of a development agreement for a building that Capital likened to the house in the movie, "The Money Pit."[1]  The agreement required Capital to complete a historic building restoration project by an extended deadline and included the remedies available to the city if Capital failed to do so.  When Capital did not perform all of the necessary work on time, the city sued for breach of contract.  On top of raising affirmative defenses, Capital countered with its own breach-of-contract claim.  Following a bench trial, the district court ruled for the city on its direct claim and against Capital on its counterclaim.  Capital challenges both aspects of that ruling on appeal.  Finding no error of law, we affirm.

## I.  Background Facts and Proceedings

In late 2013, the city devised a plan to restore one of its "most iconic" historic buildings in its downtown commercial district in hopes of preserving what was once a desirable property.  Known as the Owen Block Building, the two-story brick structure was originally built in the late 1800s as part of a mixed-use development.  For decades, the first floor housed various commercial businesses, including a local Maid-Rite, while the second floor consisted of a common area and seven residential rental units.  Despite its historical glory, the building became a hotspot for criminal activity over time and was no longer income

---

[1] This comedy from 1986 starred Tom Hanks and Shelly Long, who played a young couple struggling to repair a hopelessly dilapidated house.  The Money Pit (Amblin Entertainment 1986); *The Money Pit*, IMDB, http://www.imdb.com/title/tt0091541 (last visited Jan. 19, 2022).

producing. There were electrical issues, lack of fire safety equipment, and increasing structural damage that rendered the building uninhabitable. Due to the costs of renovations, it was left in a severely dilapidated condition and remained vacant for some time before Capital undertook the project in spring 2014.

When Capital first learned of the city's plan to restore the Owen building, it had no interest in being involved, according to the company's representative. She testified the city would have been hard pressed to find *any* developer in the community willing to shoulder the burden of reconstructing that particular property because it was like "opening a scathing wound that you may not be able to heal." She had heard from others in the industry that "the property had failed epically" under various owners due to drug activity and prostitution. Despite knowing this, Capital decided to take the project on. After researching possible funding sources, Capital negotiated for the use of tax increment financing (TIF) and historic tax credits as forms of reimbursement. Both were essential to the transaction because Capital knew that "very few financial institutions . . . would sign onto a project like this with just historic[] tax credits." Based on the city's assurances, Capital managed to secure $2.1 million in financing from a community bank to cover the initial investment. In exchange, Capital agreed to assign the anticipated TIF payments and historic tax credits to the bank. For added security, the bank obtained a mortgage on the property and required Capital to pay twenty-five percent of all expenses associated with the restoration process.

By early 2014, the parties had completed their negotiations. The city drafted a development agreement that was approved by the city council that spring. The

agreement was divided into two sections, with section A detailing the duties of Capital as the general contractor:

>2. Project Construction. The Company agrees to renovate the Project not later than December 31, 2015 and to use best efforts to promote the highest and best use of the Project throughout the term of this agreement . . . .

>3. Project Construction Standards. The Company agrees that the renovations undertaken for the Project shall be true to the historic character of the building and meet the standards necessary for a historic preservation tax credit award.

>4. Total Private Investment. The Company agrees to make a total investment in the Project of $2,100,000 with completion being in substantial conformance to the documents present[ed] to the City Council and described in the Project. . . .

>5. Minimum Assessment. The Owner agrees that the minimum taxable value of the property shall be set at $1,300,000 during the term of this agreement. . . .

>. . . .

>9. Forgivable Loan Repayment. The Company agrees to repay un-forgiven principal of the Forgivable Loan in accordance with the provisions of Section B.6 of this Agreement.

>10. Remedy. The Company hereby acknowledges that failure to comply with the requirements of this Section A, will result in the City having the right to withhold Payments under Section B of this Agreement at its sole discretion, until such time as the Company has demonstrated, to the satisfaction of the City, that it has cured such non-compliance.

In turn, section B of the agreement set forth the terms of the TIF plan in relation to the city's obligations. In that section, the second paragraph stated the city would pay Capital a maximum of $550,000 in "five (5) forgivable loan payments." Each payment was forgivable based on Capital's performance of six conditions, the first of which required "the satisfactory completion of the renovation of the building and issuance of Certificate of Occupancy." Soon after acquiring the

property, Capital received the first payment for $150,000. Yet the next three payments, each for $100,000, came more than a year later.

Unfortunately, the parties' expectations for the pace of the restoration work did not pan out. Nearly a year and a half into the project, it became clear Capital would be unable to complete the necessary renovations by the December 2015 deadline. As that deadline approached, Capital asked the city for a two-month extension to ensure the cornices on the exterior of the building met historical standards. Based on that rationale, the city ultimately agreed to extend the original completion date for three months.

By resolution, the city council approved the parties' extension agreement in January 2016. That agreement included three provisions at issue that differed from the terms of the development agreement:

1. **Extension.** The City hereby grants an extension of the Completion Date (as originally found in Section A.2 of the Agreement) to March 31, 2016 (the "Extension Date"). The City shall not pursue a breach of contract action for failure by the Company to abide by the original Completion Date requirement.

2. **Project.** The Company agrees to use its best efforts to fulfill its obligations under the Agreement and to complete the Project by the Extension Date. Furthermore, the Company will affirmatively demonstrate completion to the satisfaction of the City by the Extension Date.

3. **Remedies.** Failure to comply with the provisions of Section 2 hereof will give the City the right to do any or all of the following remedies with respect to the Agreement: (1) denial of loan forgiveness; (2) cessation of remaining forgivable loan disbursements; and/or (3) acceleration of loan repayment. The rights enumerated in the preceding sentence are not exclusive of the City's right to pursue any and all breach of contract remedies available at law and in equity.

With the extra time, Capital was able to make some exterior renovations, rebuild the cornices, and obtain a certificate of occupancy for all the units in the building, except for one.[2] But the unfinished unit was not the only aspect of the project that fell short. By the end of March, Capital still needed to make "significant progress to the final tuck pointing of the building and the final exterior façade to meet historical standards." The company representative testified that, without meeting those standards, "[t]he project couldn't be completed because per the development agreement, the historical tax credit awards had to be achieved." Just days before the extended deadline, Capital requested the fifth and final TIF payment of $100,000, but the city denied the request.

Even after the March 2016 deadline had passed and without the city's support, Capital continued to work on the project hoping to obtain a then-projected $1.8 million tax credit award. The company's efforts went on for over a year, during which time its expenses totaled $3.3 million. Yet its progress with the historic tax credits hit a standstill. As a result, the bank, which had initially contributed some financial support, backed out in the fall of 2017, requiring Capital to pay back close to $2.5 million. As a way to settle its debts, Capital agreed to convey the property through nonjudicial voluntary foreclosure proceedings. But after the bank took ownership of the property, Capital received a demand letter from the city seeking

---

[2] In briefing and oral argument, Capital asserted that the remaining unit on the first floor was intentionally left unfinished because a certificate of occupancy for the entire building would have disqualified it from receiving historic tax credits. Given the scope of the issues on appeal, we find it unnecessary to delve into a detailed discussion about the historic tax credits.

repayment of the four tendered TIF payments totaling $450,000. Given its extensive efforts until then, Capital refused.

In July 2019, the city sued Capital to recover the $450,000 based on claims for breach of contract and unjust enrichment. In its answer, Capital counterclaimed that the city was the one in breach by refusing "to provide full funding of the forgivable loans." After a two-day bench trial, the district court ruled that both the development and extension agreements unambiguously required Capital to complete the project by a date certain, and by failing to do so Capital was in breach of those contracts. As the court put it, "While the court has no doubt that [Capital] attempted to perform—both before and after March 31, 2016—it simply was not successful." Alternatively, the court held that even if the agreements were ambiguous, both of Capital's witnesses admitted that they understood "the Project had a date certain for completion rather than for a mere exercise of [Capital's] best efforts." Finally, the court rejected Capital's counterclaim after finding the extension agreement allowed the city to withhold any of the five payments under the TIF plan. Based on those conclusions, the court entered judgment against Capital and in favor of the city in the amount of $450,000 on its breach-of-contract claim. Capital now appeals.

## II. Scope and Standard of Review

We review a breach-of-contract action for correction of errors at law. *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). We are bound by the district court's fact findings if substantial evidence supports them. *Id.* But its legal conclusions and application of legal principles do not bind our decision on appeal. *Id.*

### III. Analysis

The main question before the district court, and now before us on appeal, is which party breached the contract? *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 179 (Iowa 2010). Because we face dueling breach-of-contract claims, we will address them in turn.

#### A. City's Breach-of-Contract Claim

For the city to prevail on its breach-of-contract claim, it had to show

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) [Capital's] breach of the contract in some particular way; and (5) that [it] has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). While neither party directly addressed these elements in briefing or oral argument, Capital appears to contest the district court's ruling on the third and fourth elements. We choose to begin with the one concerning Capital's breach of the extension agreement.

Capital argues the district court erred in determining it breached that agreement by failing to complete the project by the specified date. It contends the completion date was not intended to serve as a stand-alone requirement and instead proposes its obligation was, at most, to use its "best efforts" to complete the project by that date. Disregarding the testimony of its own representative— who acknowledged the extension agreement required the company to use its best efforts *and* to complete the project by the extension date—Capital now insists that it only "agreed to use its best efforts to complete that project, and which best efforts

were financially cabined by the company's commitment to expend a total of [$2.1 million] in the effort" irrespective of any deadline.

But as the city points out, Capital's argument ignores the crucial language that formed the basis for the district court's ruling on this point. While creative, Capital's proposed interpretation is at odds with the clear and unambiguous terms of the parties' agreement. *See Bradshaw v. Cedar Rapids Airport Comm'n*, 903 N.W.2d 355, 361 (Iowa Ct. App. 2017) (noting our interpretation must be "in accord with the parties' intent as evidenced by the language used in the agreement"). As in the district court, Capital quotes only part of the relevant section in the extension agreement to support its position. That part provides, "The Company agrees to use its best efforts to fulfill its obligations under the Agreement and to complete the Project by the Extension Date." Not mentioned in its appellant's brief, however, is the next sentence of the same paragraph, which states: "Furthermore, the Company will affirmatively demonstrate completion to the satisfaction of the City by the Extension Date." Although worded differently, the related section in the original development agreement also set forth these two separate requirements: (1) "to renovate the Project not later than December 31, 2015" and (2) "to use best efforts to promote the highest and best use of the Project throughout the term of this agreement."

When read in full, both agreements expressly distinguish Capital's "best efforts" obligation and its obligation to perform by the set completion date. *See Colwell v. MCNA Ins. Co.*, 960 N.W.2d 675, 679 (Iowa 2021) ("We attempt to interpret every word and every provision of a contract to give it effect, if possible."). We find the only reasonable interpretation from the words used by the

parties is that Capital had a duty to fulfill its obligations under these agreements by March 31, 2016, *and* a duty to use its best efforts in undertaking those obligations. *See NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 466 (Iowa 2010) ("[T]he important evidence of the parties' intentions at the time they entered into the contract is the words of the contract.").

As the district court pointed out, but Capital ignores on appeal, the company representative acknowledged that Capital had agreed to do more than merely exercise its best efforts to complete the project on time. We too find it significant that she gave these clear responses during her cross-examination:

> Q. This agreement didn't obligate you just to use your best efforts, did it? A. No.
> Q. Right. It obligated you to use your best efforts and to complete the project by the extension date? A. Correct.
> Q. Correct? And the project was not completed by the extension date? A. The project couldn't be completed because per the development agreement, the historical tax credit awards had to be achieved.
> Q. I appreciate that response, but the project was not completed by the extension date, correct? A. Correct.

That exchange also tracked the testimony of the city manager, who confirmed it was the city's understanding in entering the extension agreement that Capital would do everything it had agreed to do by the extended completion date. Even though we find no ambiguity in the agreements as written, we may still consider the extrinsic evidence in the record to aid our interpretation. *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). Based on the evidence presented here, we agree with the district court's conclusion that Capital was in breach of that agreement by failing to complete the project by the extension date.

As for the city's performance of the terms and conditions under the contract, Capital asserts that by failing to tender the fifth TIF payment, the city breached its obligation under section B, paragraph 6(a) of the development agreement "to make that payment once the company's total expenditures in the renovation project reached [$1.75 million.]" Capital adds, "By the time the company requested the fifth installment check, it had sunk some [$3 million] into the project, well in excess of the amount that contractually mandated the city to issue the fifth installment check." Capital complains the city improperly withheld the payment based on its general dissatisfaction with Capital's inability to complete the project. While we agree paragraph 6(a) of the development agreement did not allow the city to withhold any of the payments for dissatisfaction or impatience, we disagree that the city didn't have such discretion.

When interpreting a contract provision, we read the "contract as a whole so as to give effect to all provisions." *Hoffman v. Kounkel*, No. 15-1363, 2016 WL 4051885, at *2 (Iowa Ct. App. July 27, 2016) (internal citation omitted). Paragraph 10 of the development agreement makes clear in relation to Capital's contractual obligations:

> The Company hereby acknowledges that *failure to comply with the requirements of this Section A, will result in the City having the right to withhold Payments under Section B of this Agreement at its sole discretion*, until such time as the Company has demonstrated, to the satisfaction of the City, that it has cured such non-compliance.

(Emphasis added.)  As stated before, Capital did not fully perform its obligations in section A, which prompted the city to withhold the fifth TIF payment despite the terms described in section B.[3]

Because Capital never cured its non-compliance by the completion date, according to the agreements entered into by the parties, the city had every right to withhold that payment.  Thus, the district court was correct in deciding the city had not failed to perform any obligation under the development agreement based on its refusal to tender the final TIF payment.  For all of these reasons, we conclude the city met its burden of proving its breach-of-contract claim against Capital.

### B. Capital's Breach-of-Contract Counterclaim

The crux of Capital's arguments in support of its breach-of-contract counterclaim against the city overlap with the issues discussed in the previous section.  As the district court reflected, "[Capital] seems to be conflating the concept of an affirmative defense of failure to perform that might preclude [the city's] recovery with an affirmative counterclaim for breach of contract."  In any event, the court noted, "This may be a distinction without a difference here because [Capital] would have the burden to prove its theory under either paradigm and it failed to carry that burden."  We agree with both sentiments.

In challenging the district court's denial of its breach-of-contract counterclaim, Capital again relies on the assumption it never committed a breach because its obligation was only to use its best efforts.  In contrast, Capital alleges

---

[3] Capital argues that under paragraph 10 of the development agreement, the city was required to provide it with "written notice of noncompliance."  But that paragraph, which is quoted in full above, does not contain any such requirement.

the city was in breach of the parties' agreements by (1) refusing to pay "the fifth and final $100,000 TIF loan installment at the point when the company had expended a total of [$1.75 million] in the building renovation project," (2) failing to enforce the minimum tax assessment under the development agreement after the bank acquired the property, and (3) accelerating the TIF loan "well before those loan installments had even matured, let alone became due and owing as specified in that provision of the agreement." We have already rejected the first claim that the city breached a contractual obligation by refusing to tender the final TIF payment. We likewise find no merit in Capital's remaining two claims.

In reaction to Capital's breach of the extension agreement, the city was entitled to exercise its remedies under paragraph 3 of the same agreement. That paragraph gave the city a right to pursue "any or all of the following remedies with respect to the Agreement: (1) denial of loan forgiveness; (2) cessation of remaining forgivable loan disbursements; and/or (3) acceleration of loan repayment" upon Capital's failure to compete the project by the extension date. Capital agreed to those terms, allowing the city to accelerate the full balance of the TIF loan and demand repayment of the $450,000.

We are left then with the second claim related to the minimum tax assessment. While unclear, it appears that Capital's argument on this issue is simply that the city should have continued enforcing the minimum tax assessment

amount stipulated in the development agreement after the bank took ownership of the building in late 2017.[4]  We find no legal basis for this argument.

For one thing, Capital points to no provision in the agreement that ever obligated the city to oversee the minimum taxable value of the property while they were in a contractual relationship.  In fact, the provision on the tax assessment falls under the section titled "Company's Covenants," and states, "The Owner agrees that the minimum taxable value of the property shall be set at [$1.3 million] during the term of this agreement."  This argument fails for the second reason that, as Capital itself admits, the bank became the owner *after* the parties' agreement had expired.  Capital "cannot pluck a single statement out of context and feather it into a contract." *Petro v. Palmer Coll. of Chiropractic*, 945 N.W.2d 763, 780 (Iowa 2020).  Because Capital fails to show the city breached the contract in some way, we, like the district court, find its counterclaim without merit.  Having found no reversible error, we affirm.

**AFFIRMED.**

---

[4] For context, we note that the record shows the minimum tax assessment went from $1.3 million to nearly $500,000 after Capital transferred title of the Owen Block Building to the bank.